UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

BERNARD THOMAS,

                              Plaintiff,

        -v-

LIEUTENANT DECASTRO, T.
HUMPHREY, Deputy Supt. of Security,
DEPUTY SUPT. OF SEC. J. KING, LT. KATZ,
C.O. D. VELEZ, MS. BRENDA CLARK, Sr.
Mail Clerk, S. ENCARNACION, Muslim
Chaplain, ALBERT PRACK, Director of S.H.U.,
C.O. LECHANCE, LINDSTRAND, Deputy of
Admin, and DIRECTOR DONALD
VENETTOZZI,

                              Defendants.

Case No. 14-CV-6409 (KMK)

<u>OPINION & ORDER</u>

---

<u>Appearances:</u>

Bernard Thomas
New York, NY
*Pro Se Plaintiff*

Kristin R. Vogel, Esq.
New York State Office of the Attorney General
New York, NY
*Counsel for Defendants*

KENNETH M. KARAS, District Judge:

        Plaintiff Bernard Thomas ("Plaintiff"), currently an inmate at Metropolitan Correctional

Center ("MCC") and formerly in the custody of the New York State Department of Corrections

and Community Supervision ("DOCCS"), filed the instant Action pursuant to 42 U.S.C. § 1983

against Lieutenant John DeCastro ("DeCastro"), Deputy Superintendent of Security Timothy

Humphrey ("Humphrey"), Deputy Superintendent of Programming Jean King ("King"),

Lieutenant Steven Katz ("Katz"), Correction Officer Damian Velez ("Velez"), Brenda Clark

("Clark"), Imam Samuel Encarnacion ("Encarnacion"), Director of Special Housing Albert Prack ("Prack"), Correction Officer J. LaChance ("LaChance"), Deputy Superintendent of Administration Jeffrey Lindstrand ("Lindstrand"), and Director Donald Venettozzi ("Venettozzi") (collectively "Defendants").  Plaintiff alleges that Defendants violated his rights under the First and Fourteenth Amendments of the United States Constitution arising out of disciplinary hearings held at Woodbourne Correctional Facility ("Woodbourne"), as well as violations of the Eighth Amendment based upon allegedly unsafe and unsanitary conditions of confinement at Great Meadow Correctional Facility ("Great Meadow").  *See generally* Compl. (Dkt. No. 2).)  Before the Court is Defendants' Motion To Dismiss the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) (the "Motion").  (Dkt. No. 46.)  For the reasons described herein, Defendants' Motion is granted.

## I.  Background

### A.  Factual History

The following facts are drawn from Plaintiff's Complaint and attached exhibits and are taken as true for the purpose of resolving the instant Motion.

#### 1.  April 22, 2012 Misbehavior Report

On April 22, 2012, Plaintiff received a misbehavior report (the "April 22 Report") from Velez alleging Plaintiff had violated disciplinary rules 104.13 (Creating a Disturbance), 107.10 (Interference with Employee), 106.10 (Refusing Direct Order), and 109.12 (Movement Regulation Violation).  (*See* First Cause of Action ("First COA") 13 (Dkt. No. 2); First COA Ex. B ("May 1, 2012 Disposition") 23 (Dkt. No. 2).)[1]  Plaintiff alleges that Velez fabricated the April

---

[1] Plaintiff has submitted his Complaint as six separate causes of action across multiple ECF entries rather than as a singular Complaint.  For ease of reference, the Court cites to the

22 Report, (*see* First COA 13), and claims the report was "very inadequate" because it was "not clear" what the charges were, (*id.*). The next day, "De[C]astro[,] who has a personal v[e]ndetta against [P]laintiff[,] changed the status of the [April 22 Report], and altered/rewrote over the original misbehavior report." (*Id.*) DeCastro reviewed the initial report, and the final misbehavior report was delivered to Plaintiff on April 23, 2012. (*See* May 1, 2012 Disposition 23.) Plaintiff alleges that DeCastro's alteration denied him adequate notice of the charges against him prior to the commencement of the disciplinary hearing, as is required under 7 N.Y. Comp. Codes R. & Regs. § 251-3.1. (*See* First COA 13–14.)

Plaintiff's disciplinary hearing was then held on May 1, 2012, where Humphrey served as the presiding hearing officer. (*See id.* at 14.) Humphrey "notice[d] the wrong" done by DeCastro and was "suppo[sed] to adjourn the hearing so [that] [P]laintiff c[ould] prepare for his defense." (*Id.*) Yet, while Humphrey "t[ook] notice that [Plaintiff] did not receive a clear adequate copy of the misbehavior report," he failed to rectify the issue. (*Id.*) Ultimately, Humphrey found Plaintiff guilty of all charges except for the charged violation of disciplinary rule 104.13 (Creating a Disturbance). (*See* May 1, 2012 Disposition 23.) Plaintiff was sentenced to 45 days in keeplock and 45 days of lost privileges, including the loss of packages, commissary, and access to the telephone. (*See* First COA 16; May 1 Disposition 23.) Plaintiff timely appealed Humphrey's decision to Prack, but he allegedly "rubber stamped" the initial determination and denied Plaintiff's appeal. (First COA 16.)

---

claims by each cause of action, and then to the ECF-generated page numbers stamped at the top of the given docket entry for that cause of action.

<u>2. April 2, 2013 Misbehavior Report and April 8, 2013 Hearing</u>

On an unspecified date between March 25 and March 29, 2013, Plaintiff sent legal mail to an unnamed attorney. (*See* Second Cause of Action ("Second COA") 35 (Dkt. No. 2).) However, this letter was ultimately returned to Plaintiff, who claims that it was opened without his authorization by DeCastro and Clark, the mail clerk. (*Id.*) DeCastro then filed a misbehavior report on April 2, 2013 related to this letter, charging Plaintiff with violating disciplinary rules 118.11 (Facility Correspondence Violation), 114.10 (Smuggling), and 116.10 (Property Damage or Loss). (*See id.*; Second COA Ex. A ("April 2, 2013 Report") 41 (Dkt. No. 2).) According to DeCastro's report, which Plaintiff claims is entirely false, Plaintiff sent non-legal mail to an ex-inmate under the guise of legal mail to subvert proper correspondence procedures. (*See* Second COA 35; April 2, 2013 Report 41.) Plaintiff claims that DeCastro and Clark concocted this story and conspired together to "cover their actions," which included the allegedly unconstitutional opening of Plaintiff's legal mail. (Second COA 35.) Plaintiff further alleges that Clark, as the senior mail clerk, continued to open Plaintiff's legal correspondence outside of his presence after this incident. (*See id.* at 36.) Specifically, on April 15, 2013, Plaintiff received a letter marked as "Legal Mail" from Fordham University School of Law. (*Id.*) However, this mail was already opened when delivered to Plaintiff. (*Id.*)

At the April 8, 2013 hearing before King, Plaintiff was found guilty of all three charges and sentenced to three months of keeplock and lost privileges, including the loss of packages, commissary, and access to the telephone. (*See* Second COA Ex. B ("April 8, 2013 Disposition") 3 (Dkt. No. 2-1).) Moreover, in conjunction with finding Plaintiff guilty of all three charges, King removed Plaintiff from his elected position on the Inmate Grievance Resolution Committee (the "IGRC"). (*See* Fourth Cause of Action ("Fourth COA") 36 (Dkt. No. 2-2).) Plaintiff alleges

that King used this unrelated disciplinary hearing as an opportunity to remove Plaintiff from his position on the IGRC without complying with the proper notice and hearing requirements as mandated by 7 N.Y. Comp. Codes R. & Regs. § 701.4. (*See id.* at 36–37.)

Ultimately, King's April 8, 2013 disposition was reviewed and reversed by Prack on July 2, 2013. (*See* Second COA Ex. F ("July 2, 2013 Reversal") 25 (Dkt. No. 2-1).)

### 3. April 26, 2013 Misbehavior Report and Disciplinary Hearing

On April 24, 2013, while held in keeplock, Plaintiff sought to speak to Encarnacion, the Imam at Woodbourne. (*See* Third Cause of Action ("Third COA") 3 (Dkt. No. 2-2).) Eventually, Encarnacion came to visit Plaintiff that same day, where he proceeded to yell at Plaintiff for an unspecified reason. (*See id.*) Encarnacion then left, requesting that Plaintiff no longer call for him. (*See id.*) Two days later, Plaintiff received an allegedly false misbehavior report for violation of disciplinary rule 102.10 (Threats) arising out of his previous interaction with Encarnacion. (*See id.*; Third COA Ex. B ("May 7, 2013 Disposition") 17.) Plaintiff claims that this misbehavior report was in retaliation for a "serious incident" Encarnacion had at Woodbourne, where the "majority of the [M]uslims at Woodbourne . . . flipped/sold him out and got him locked out [of the facility]." (Third COA 3–4.) Plaintiff was allegedly involved in an "investigation" of Encarnacion at Woodbourne commenced by the facility, where Plaintiff spoke to the investigator regarding Encarnacion. (*Id.* at 4.) Because of this, Encarnacion lied about Plaintiff's conduct, allegedly at the behest of DeCastro, which resulted in the filing of false charges against Plaintiff and arranging for Plaintiff's transfer from Woodbourne. (*Id.*)

As a result of these charges, Plaintiff was subject to a disciplinary hearing before King that commenced on April 29, 2013, and was completed on May 7, 2013. (*Id.* at 5.) Plaintiff was ultimately found guilty of violating disciplinary rule 102.10 and sentenced to 60 days in the

special housing unit ("SHU") to begin on July 1, 2013 given Plaintiff's current keeplock status given the April 8, 2013 disposition. (*Id.*; May 7, 2013 Disposition 17.) Plaintiff alleges that King was "bias[ed], un[]fair, and very prejudiced," and "imposed a very harsh penalty and exceeded the guidelines for th[e] charge," which itself was not supported by the evidence. (Third COA 5.) This disposition was affirmed by Venettozzi on July 10, 2013 after Plaintiff filed a timely appeal of King's decision. (*See* Third COA Ex. E. ("July 10, 2013 Review") 26.)

However, Plaintiff alleges that, on May 8, 2013, Katz "took it upon himself to (Forge) re-write . . . and change[] the hearing disposition that was already complete[d]" on May 7, 2013. (Third COA 6.) Katz allegedly corrected King's original disposition by having Plaintiff's confinement in SHU commence immediately, rather than having Plaintiff continue to serve his "Invoked-Keeplock" time that arose out of the April 8, 2013 disposition. (*See id.*; Third COA Ex. C ("Revised May 7, 2013 Disposition") 19.) Effectively, Katz swapped the order of Plaintiff's penalties. Plaintiff claims that this created confusion regarding his sentences and resulted in him spending extra days in SHU, (*see* Third COA 6–7), and a delayed release from keeplock upon Prack's reversal of the April 8, 2013 disposition, (*see id.* at 7–8).

### 4. Incidents at Great Meadow

On either May 28, 2013 or May 29, 2013, Plaintiff was transferred from Woodbourne to Great Meadow. (*See* Fifth Cause of Action ("Fifth COA") 19 (Dkt. No. 2-3).) Roughly one month after this transfer, on June 24, 2013, Plaintiff alleges that the "B1–SHU officials," including LaChance, failed to properly sanitize the showers after an allegedly HIV-positive inmate showered and bled "all over the shower floor." (*Id.*) Instead of cleaning the spill, the unnamed officials escorted the other inmate to the medical clinic, but failed to inform Plaintiff of the spill. (*See id.*) Plaintiff did not notice the blood upon entering the shower or during the

entirety of his 8 minute shower because the floor was painted black.  (*See id.*)  However, upon

getting out of the shower he noticed that he was "standing in blood" and confirmed with the

HIV-positive inmate what had occurred.  (*Id.* at 19–20.)  Plaintiff took an HIV test and was

"liv[ing] in fear and was mentally distress[ed] and very traumatize[d]" while awaiting the results.

(*Id.* at 20.)

On October 28, 2013, another blood spill allegedly occurred, this time in the mess hall at

Great Meadow.  (*See id.*)  Specifically, Plaintiff clams that several unnamed officials failed to

clear the area before cleaning the spill with numerous chemicals.  (*See id.*)  As a result of his

exposure to these chemicals, Plaintiff, who allegedly suffers from asthma, experienced chest

pain, difficulty breathing, coughing, and emotional distress.  (*See id.* at 21.)

In addition to the blood spill, the mess hall at Great Meadow was allegedly filled with

birds.  (*See* Sixth Cause of Action ("Sixth COA") 6 (Dkt. No. 2-4).)  On an unspecified date,

Plaintiff was eating in the mess hall, where he and his food were defecated on by one of the birds

flying overhead.  (*See id.*)  Plaintiff informed an unnamed officer about this incident, but that

complaint was "disregarded."  (*Id.*)  The birds and their feces are "all over the mess[]hall," and

while unnamed officials claim they are "try[ing] to eradicate the birds," nothing has been done.

(*Id.*)

### B.  Procedural History

Plaintiff filed his Complaint and attached exhibits on August 5, 2014.  (*See* Compl. (Dkt.

No. 2).)  That same day, Plaintiff requested to proceed in forma pauperis ("IFP").  (*See* Request

to Proceed IFP (Dkt. No. 1).)  The Court granted Plaintiff's request for IFP status on November

18, 2014.  (Order Granting IFP Application (Dkt. No. 4).)

On December 1, 2014, the Court issued an order of service, and ordered the Clerk of Court to send Plaintiff a U.S. Marshals Service Process Receipt and Return form ("USM-285 form") for each Defendant and for Plaintiff to complete a form for each Defendant and return those forms to the Court. (*See* Order of Service (Dec. 1, 2014) (Dkt. No. 6).) The service package and Order of Service were then mailed to Plaintiff at Great Meadow, his address listed on the docket, but ultimately returned to sender on December 11, 2014 and December 15, 2014, respectively. (*See* Dkt. (entries for Dec. 15, 2014 and Jan. 16, 2015).) The service package was sent to Plaintiff's updated address on January 16, 2015, but was again returned to the sender as undeliverable. (*See* Dkt. (entries for Jan. 16, 2015 and Mar. 5, 2015).)

On June 2, 2015, the Court ordered the Clerk of Court to resend the Order of Service and service package to Plaintiff's updated address. (*See* Order of Service (June 2, 2015) (Dkt. No. 10).) On August 3, 2015, the service package was returned as undeliverable. (*See* Dkt. (entry for Aug. 3, 2015).) On November 4, 2016, the Court again requested that the Clerk of Court resend the Orders of Service and the service package to Plaintiff's updated address. (*See* Order of Service (Nov. 4, 2016) (Dkt. No. 19).) The USM-285 form was received on November 17, 2016 and all Defendants were deemed to have been served on January 18, 2017. (*See* Order (Dkt. No. 30).)

On March 7, 2017, counsel for Defendants submitted a letter to the Court requesting permission to file a Motion To Dismiss on behalf of all Defendants pursuant to Federal Rule of Civil Procedure 12(b)(6). (*See* Letter from Kristen R. Vogel, Esq., to Court (Dkt. No. 39).) On March 21, 2017, the Court entered an Order that Defendants could file their Motion To Dismiss by April 18, 2017, and Plaintiff should respond to any Motion by May 16, 2017. (*See* Mot. Scheduling Order (Dkt. No. 40).)

On April 18, 2017, Defendants filed their Motion To Dismiss and accompanying papers. (*See* Dkt. Nos. 46–47.) In the interim, Plaintiff sought appointment of counsel, (*see* Letter from Plaintiff to Court (April 27, 2017) (Dkt. No. 50)), as well as a 30-day extension to file his opposition to Defendants' Motion, (*see* Letter from Plaintiff to Court (May 4, 2017) (Dkt. No. 51)). The Court granted Plaintiff's request for an extension on May 15, 2017, (*see* Order (Dkt. No. 52)), but denied Plaintiff's request for counsel on May 24, 2017, (*see* Order (Dkt. No. 53)).

Plaintiff filed his opposition to Defendants' Motion and accompanying papers on June 12, 2017. (*See* Dkt. Nos. 54–55.) In response, Defendants filed their Reply on July 5, 2017. (*See* Dkt. No. 56.)

## II. Discussion

### A. Standard of Review

The Supreme Court has held that although a complaint "does not need detailed factual allegations" to survive a motion to dismiss, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration and internal quotation marks omitted). Indeed, Rule 8 of the Federal Rules of Civil Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Id.* (alteration and internal quotation marks omitted). Rather, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Although "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563, and a plaintiff must allege "only enough facts to state a claim to relief that

is plausible on its face," *id.* at 570, if a plaintiff has not "nudged [his] claim[] across the line from conceivable to plausible, the[] complaint must be dismissed," *id.*; *see also Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" (second alteration in original) (citation omitted) (quoting Fed. R. Civ. P. 8(a)(2))); *id.* at 678–79 ("Rule 8 marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

"[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint," *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam), and "draw[] all reasonable inferences in favor of the plaintiff," *Daniel v. T&M Prot. Res., Inc.*, 992 F. Supp. 2d 302, 304 n.1 (S.D.N.Y. 2014) (citing *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012)). Additionally, "[i]n adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Leonard F. v. Isr. Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) (internal quotation marks omitted); *see also Wang v. Palmisano*, 157 F. Supp. 3d 306, 317 (S.D.N.Y. 2016) (same).

Where, as here, a plaintiff proceeds pro se, the court must "construe[] [his] [complaint] liberally and interpret[] [it] to raise the strongest arguments that [it] suggest[s]." *Sykes v. Bank of Am.*, 723 F.3d 399, 403 (2d Cir. 2013) (internal quotation marks omitted). However, "the liberal

treatment afforded to pro se litigants does not exempt a pro se party from compliance with relevant rules of procedural and substantive law." *Bell v. Jendell*, 980 F. Supp. 2d 555, 559 (S.D.N.Y. 2013) (internal quotation marks omitted); *see also Caidor v. Onondaga Cty.*, 517 F.3d 601, 605 (2d Cir. 2008) ("[P]ro se litigants generally are required to inform themselves regarding procedural rules and to comply with them." (italics and internal quotation marks omitted)).

B. Analysis

1. Procedural Due Process Claims

Plaintiff contends that, on three separate occasions, Defendants violated his procedural due process rights. First, Plaintiff alleges that Velez's April 22 Report, DeCastro's alteration of that report, and Humphrey's failure to correct this error at the hearing and sentence of 45 days in keeplock constituted a due process violation. (*See* First COA 13–16.) Second, Plaintiff alleges that DeCastro issued the April 2, 2013 Report, and that King violated Plaintiff's procedural due process rights by failing to properly give notice as the possible punishment of removal from the IGRC as a result of the April 8, 2013 hearing. (*See* Second COA 35–36; Fourth COA 36–37.) Third, Plaintiff contends that Encarnacion engaged in retaliatory conduct by issuing a false misbehavior report, and as a result King violated Plaintiff's due process rights at his April 26, 2013 hearing by way of her bias and prejudice, as well as the sentence of 60 days in SHU. (*See* Third COA 3–5.) Moreover, in connection with this third incident, Plaintiff alleges that Katz rewrote King's disposition, substantively altering his sentence without notice. (*See id.* at 6–8.)[2]

---

[2] To the extent Plaintiff claims that Velez's, DeCastro's, or Encarnacion's allegedly false misbehavior reports each by itself constituted a due process violation, such a claim fails. *See Benitez v. Ham*, No. 04-CV-1159, 2009 WL 3486379, at *21 (N.D.N.Y. Oct. 21, 2009) ("[A] correctional officer's filing of unfounded charges does not give rise to procedural due process liability." (citing *Freeman v. Rideout*, 808 F.2d 949, 953–54 (2d Cir. 1986)); *see also Thomas v. Demeo*, No. 15-CV-9559, 2017 WL 3726759, at *10 (S.D.N.Y. Aug. 28, 2017) (same).

"[T]o present a due process claim, a plaintiff must establish (1) that he possessed a liberty interest and (2) that the defendant(s) deprived him of that interest as a result of insufficient process." *Ortiz v. McBride*, 380 F.3d 649, 654 (2d Cir. 2004) (first alteration in original) (internal quotation marks omitted). The Supreme Court has held that inmates retain due process rights in prison disciplinary proceedings. *See Wolff v. McDonnell*, 418 U.S. 539, 563–72 (1974) (describing the procedural protections that inmates are to receive when subject to significant disciplinary punishment). However, the Supreme Court has clarified that "[p]rison discipline implicates a liberty interest [only] when it 'imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.'" *Ortiz*, 380 F.3d at 654 (quoting *Sandin v. Conner*, 515 U.S. 472, 484 (1995)). The Second Circuit has explained that "[t]he length of disciplinary confinement is one of the guiding factors in applying *Sandin*'s atypical and significant hardship test." *Hanrahan v. Doling*, 331 F.3d 93, 97 (2d Cir. 2003) (internal quotation marks omitted). The duration of disciplinary confinement, however, is "not the only relevant factor," and the Second Circuit has "explicitly avoided a bright line rule that a certain period of SHU confinement automatically fails to implicate due process rights." *Palmer v. Richards*, 364 F.3d 60, 64 (2d Cir. 2004). Indeed, "[t]he conditions of confinement are a distinct and equally important consideration in determining whether a confinement in SHU rises to the level of atypical and severe hardship," and, therefore, courts should consider "the extent to which the conditions of the disciplinary segregation differ from other routine prison conditions." *Id.* (internal quotation marks omitted); *see also Sealey v. Giltner*, 197 F.3d 578, 586 (2d Cir. 1999) ("Both the conditions and their duration must be considered, since especially harsh conditions

---

However, the Court will address the allegations against DeCastro and Encarnacion in more detail within the context of Plaintiff's First Amendment retaliation claims.

endured for a brief interval and somewhat harsh conditions endured for a prolonged interval might both be atypical." (citation omitted)).

As a guidepost to determine whether due process protections are required in the prison context, the Second Circuit has instructed that "[w]here the plaintiff was confined for an intermediate duration—between 101 and 305 days—development of a detailed record of the conditions of the confinement relative to ordinary prison conditions is required." *Palmer*, 364 F.3d at 64–65 (internal quotation marks omitted); *see also Abdur-Raheem v. Caffery*, No. 13-CV-6315, 2015 WL 667528, at *5 (S.D.N.Y. Feb. 17, 2015) (same). Moreover, "although shorter confinements under normal SHU conditions may not implicate a prisoner's liberty interest, [the Second Circuit has] explicitly noted that SHU confinements of fewer than 101 days could constitute atypical and significant hardships if the conditions were more severe than the normal SHU conditions . . . or a more fully developed record showed that even relatively brief confinements under normal SHU conditions were, in fact, atypical." *Palmer*, 364 F.3d at 65 (citation omitted). Indeed, "[a]bsent a detailed factual record, courts typically affirm dismissals of due process claims where the period of time spent in SHU was short—*e.g.*, thirty days—and there was no indication of unusual conditions." *Houston v. Cotter*, 7 F. Supp. 3d 283, 298 (E.D.N.Y. 2014) (citing *Palmer*, 364 F.3d at 66).

Regarding the process an inmate is due, a disciplinary hearing comports with due process when an inmate receives "advance written notice of the charges; a fair and impartial hearing officer; a reasonable opportunity to call witnesses and present documentary evidence; and a written statement of the disposition, including supporting facts and reasons for the action taken." *Luna v. Pico*, 356 F.3d 481, 487 (2d Cir. 2004). "In the context of prison disciplinary hearings, the Second Circuit has said that its 'conception of an impartial decisionmaker is one who, *inter*

*alia*, does not prejudge the evidence and who cannot say, with . . . utter certainty . . . , how he would assess evidence he has not yet seen.'" *Rahman v. Acevedo*, No. 08-CV-4368, 2011 WL 6028212, at *7 (S.D.N.Y. Dec. 5, 2011) (quoting *Patterson v. Coughlin*, 905 F.2d 564, 570 (2d Cir. 1990)).

### a.  Keeplock and SHU Confinement

To make out a due process claim related to his keeplock and SHU confinement, Plaintiff must plausibly allege: (1) that there was a deprivation of a protected liberty interest; and (2) that such deprivation was the result of the procedural defects. *See Ortiz*, 380 F.3d at 654. Here, the first element of Plaintiff's due process claim has not been met as to any of the disciplinary actions.

Following the April 22, 2012 Report and subsequent hearing, Plaintiff was sentenced to 45 days in keeplock, although the attached disposition indicates that he was in fact only subjected to 10 days of such confinement with the remaining 35 days being suspended. (*See* May 1, 2012 Disposition 23.) It is well settled that 10 days, absent allegations of any "atypical and severe hardship," is an insufficiently short period of time to establish the violation of a liberty interest. *Palmer*, 364 F.3d at 64. To that end, even had Plaintiff served 45 days in keeplock, Plaintiff's Complaint is devoid of *any* allegations regarding the conditions of his keeplock confinement. The only details provided by Plaintiff regarding this period are that he was not allowed access to "phones, packages, [and] commissary." (First COA 16.) While the Second Circuit has declined to "delineate the precise contours of 'normal' SHU confinement . . . it is sufficient to note that, ordinarily, SHU prisoners are kept in solitary confinement for twenty-three hours a day, provided one hour of exercise in the prison yard per day, and permitted two showers per week." *Ortiz*, 380 F.3d at 655. Plaintiff makes no allegations that he was kept in

SHU for longer than the typical period, or that he was denied exercise, adequate showers, or was generally subjected to any conditions that were "more onerous than usual," *Davis v. Barrett,* 576 F.3d 129, 133 (2d Cir. 2009), and in fact makes no allegations about the conditions of his keeplock beyond the withholding of privileges as detailed in the disposition. *See Branch v. Goord,* 05-CV-6495, 2006 WL 2807168, at *4 (S.D.N.Y. Sept. 28, 2006) ("Plaintiff's privileges were withheld during confinement, but lost privileges do not constitute an atypical and significant hardship because they are within the expected parameters of the sentence imposed by a court of law." (internal quotation marks omitted)).

Similarly, Plaintiff has failed to establish that he was deprived of any actionable liberty interest as it relates to the April 8, 2013 Report and subsequent hearing. Here, Plaintiff was sentenced to 90 days in keeplock, but again, the time served appears to have been limited to 30 days, with the remaining two months being suspended. (*See* April 8, 2013 Disposition 3.) As this Court has previously noted, the "[30]-day confinement is right at the cut-off suggested by [the Second Circuit] for a presumptively typical confinement." *Aikens v. Royce*, No. 14-CV-663, 2015 WL 7758892, at *6 (S.D.N.Y. Dec. 1, 2015) (internal quotation marks omitted). And yet again, even if Plaintiff were to have spent 90 days in keeplock, he has failed to make any allegations regarding the conditions of his confinement. The only details provided regarding these conditions are delineated in the April 8, 2013 disposition, indicating that Plaintiff was subjected to the loss of privileges such as access to the phones, packages, and commissary. (*See* April 8, 2013 Disposition 3.) Thus, even if Plaintiff were subjected to 90 days of keeplock, the absence of any allegations regarding the conditions of that confinement means that Plaintiff has "failed to demonstrate a liberty interest entitling [him] to due process." *Vogelfang v. Capra,* 889 F. Supp. 2d 489, 511 (S.D.N.Y. 2012).

For these same reasons, Plaintiff has not established deprivation of a liberty interest as related to the April 24, 2013 Report and subsequent hearing. Plaintiff's sentence of 60 days in SHU is generally viewed as a shorter period of confinement, and the length of confinement is a factor that the Court considers in determining whether disciplinary punishment "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Hanrahan*, 331 F.3d at 97 (quoting *Sandin*, 515 U.S. at 484). However, "[t]he conditions of confinement are a distinct and equally important consideration in determining whether a confinement in SHU rises to the level of atypical and severe hardship." *Palmer*, 364 F.3d at 64 (internal quotation marks omitted). Here, Plaintiff's claim fails once more. Plaintiff has failed to allege any facts that plausibly establish that his confinement in keeplock was atypical, as it appears Plaintiff was again subjected solely to the loss of privileges such as access to the phones, packages, and commissary. (May 7, 2013 Disposition 17.) As discussed above, "lost privileges do not constitute an atypical and significant hardship because they are within the expected parameters of the sentence imposed by a court of law." *Branch*, 2006 WL 2807168, at *4 (internal quotation marks omitted). Thus, Plaintiff's 60-day confinement in SHU, absent any allegations regarding unduly harsh conditions, is by itself insufficient to establish a liberty interest protected by due process.

Accordingly, because Plaintiff's allegations regarding his keeplock and SHU confinement do not plausibly suggest that "the conditions of the disciplinary segregation differ[ed] from other routine prison conditions," *Palmer*, 364 F.3d at 64 (internal quotation marks omitted), Plaintiff has failed to establish a liberty interest as related to the imposition of various keeplock and SHU penalties. Therefore, the Court grants Defendants' Motion To Dismiss Plaintiff's due process claim against hearing officers Humphrey and King, as well as

reviewing officers Prack, Katz, and Venettozzi. *See Acevedo v. Fischer*, No. 12-CV-6866, 2014 WL 5015470, at *15 (S.D.N.Y. Sept. 29, 2014) (noting that "a number of courts in [the Second] Circuit . . . have dismissed claims in which [the] plaintiffs alleged spending between [40] and [50] days in punitive segregation or faced other comparable discipline[,] . . . conclud[ing] that, in the absence of some allegation that the conditions of keeplock or SHU confinement were in some way unusual, plaintiffs had failed to allege the violation of a protected liberty interest" (internal quotation marks omitted)) (collecting cases); *O'Diah v. Artus*, No. 10-CV-6705, 2013 WL 1681834, at *2–3 (W.D.N.Y. Apr. 17, 2013) (dismissing case where the plaintiff, who was confined for 111 days, "failed to allege facts showing that the conditions of his confinement, combined with the duration of his confinement, created an atypical and significant hardship" (internal quotation marks omitted)); *Edwards v. Horn*, No. 10-CV-6194, 2012 WL 760172, at *10 (S.D.N.Y. Mar. 8, 2012) (explaining that "[s]everal courts have concluded that, absent unusual conditions, 30 days of segregation is not an atypical or significant hardship under *Sandin*") (collecting cases); *Torres v. Logan*, No. 10-CV-6951, 2011 WL 1811003, at *4 (S.D.N.Y. May 11, 2011) (dismissing the plaintiff's due process claim where he alleged that he was confined for "a little over two-thirds of the 90 days sentence," because the plaintiff "fail[ed] to allege any facts regarding the conditions of his confinement, including whether they were abnormal or unusual" (alteration and internal quotation marks omitted)), *adopted by* 2011 WL 3894386 (S.D.N.Y. June 13, 2011).

### b. Removal from the IGRC

To the extent Plaintiff claims his removal from the IGRC, following the April 8, 2013 disposition issued by King, constituted a due process violation, that claim also fails. DOCCS regulations require "a limited due process hearing," including "notice of the charges . . .

indicat[ing] that the affirmation of the[] charges may result in removal from the IGRC," prior to removal from the IGRC, 7 N.Y. Comp. Codes R. & Regs. § 701.4(c)(1), and thus Plaintiff contends that failure to comply with § 701.4 constitutes a violation of due process. However, as the Supreme Court held in *Sandin*, while New York "may under certain circumstances create liberty interests which are protected by the Due Process Clause . . . these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force . . . nonetheless imposes [an] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin*, 515 U.S. at 483–84. The Court is unaware of any cases finding that there is a protected liberty interest in serving as an IGRC representative; indeed other courts within the Second Circuit have found to the contrary. *See Marrero v. Kirkpatrick*, 659 F. Supp. 2d 422, 425–26 (W.D.N.Y. 2009) (holding that there is no established liberty interest in serving as an IGRC representative); *Alnutt v. Cleary*, 913 F. Supp. 160, 168 (W.D.N.Y. 1996) ("[U]nder the new standards adopted by the Supreme Court in *Sandin,* the State's regulation limiting the transfer of IGRC representatives did not create a liberty interest and does not provide a basis for a civil rights action if that policy is violated.") Plaintiff has identified no legal basis for the Court to find that his removal from the IGRC without notice of that possible punishment at his disciplinary hearing constituted an "atypical and significant hardship" such that it would constitute a liberty interest.

However, even were the Court to assume, *arguendo*, that such a liberty interest did exist, all Defendants would be protected by qualified immunity. "The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would

have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal quotation marks omitted). "[Qualified] immunity protect[s] government's ability to perform its traditional functions . . . by helping to avoid unwarranted timidity in performance of public duties, ensuring that talented candidates are not deterred from public service, and preventing the harmful distractions from carrying out the work of government that can often accompany damages suits." *Filarsky v. Delia*, 566 U.S. 377, 389–90 (2012) (second alteration in original) (citation and internal quotation marks omitted). Qualified immunity shields a defendant from standing trial or facing other burdens of litigation "if either (a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law." *Johnson v. Newburgh Enlarged Sch. Dist.*, 239 F.3d 246, 250 (2d Cir. 2001) (internal quotation marks omitted).

The Supreme Court has held that when evaluating an asserted qualified immunity defense, a court may begin by examining whether a reasonable officer in the defendant's position would have believed his or her conduct would violate the asserted constitutional right. *See Pearson*, 555 U.S. at 236 (overruling *Saucier v. Katz*, 533 U.S. 194 (2001), and explaining that judges are no longer required to begin by deciding whether a constitutional right was violated but are instead "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first"). The Supreme Court has further instructed that "[t]o be clearly established, a right must be sufficiently clear that every reasonable official would [have understood] that what he is doing violates that right. In other words, existing precedent must have placed the statutory or constitutional question beyond debate." *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (second alteration in original) (citations and internal quotation marks omitted). Furthermore, "the right allegedly violated must be

19

established, not as a broad general proposition, but in a particularized sense so that the contours of the right are clear to a reasonable official." *Id.* at 665 (citations and internal quotation marks omitted). Otherwise stated, to determine whether a right is clearly established, courts must determine "whether (1) it was defined with reasonable clarity, (2) the Supreme Court or the Second Circuit has confirmed the existence of the right, and (3) a reasonable defendant would have understood that his conduct was unlawful." *Doninger v. Niehoff*, 642 F.3d 334, 345 (2d Cir. 2011).

Ultimately, the failure to inform Plaintiff of the possible *punishments* he was subject to is has not been clearly established by either the Supreme Court or the Second Circuit. As previously discussed, a disciplinary hearing comports with due process when an inmate receives "advance written notice of the charges; a fair and impartial hearing officer; a reasonable opportunity to call witnesses and present documentary evidence; and a written statement of the disposition, including supporting facts and reasons for the action taken." *Luna*, 356 F.3d at 487; *see also Wolff*, 418 U.S. at 563–64 (same). No Supreme Court or Second Circuit case involving a prisoner's removal from the IGRC has held that due process rights adhere to such removal. Nor has either court set forth any requirement that an inmate be given notice of the potential *penalties* to be imposed based on the charges in a misbehavior report.[3] Accordingly, because there is no clearly established constitutional right to receive notice of the specific *penalties* that may be imposed in response to a misbehavior report, nor has it been clearly established that removal from the IGRC *requires* notice and a hearing to comport with the Constitution, Defendants' alleged conduct is protected by qualified immunity.

---

[3] In any event, the DOCCS regulations governing disciplinary hearings provide that among the penalties that may be imposed is removal of an inmate from the IGRC. *See* 7 N.Y. Comp. Codes R. & Regs. § 254.7(a)(1)(d)(xi).

### 2. First Amendment Retaliation Claims

Plaintiff's claims that DeCastro, who allegedly has "a personal v[e]ndetta against [P]laintiff[,]" retaliated against Plaintiff by filing and altering the April 22 Report. (First COA 13.) DeCastro, along with Encarnacion, allegedly retaliated against Plaintiff roughly one year later, filing a false misbehavior report on or about April 26, 2013, claiming that Plaintiff violated disciplinary rule 102.10 in his interaction with Encarnacion two days earlier. (*See* Third COA 3–4.) The Court will address the claims against DeCastro and Encarnacion in turn.

A plaintiff asserting a First Amendment retaliation claim must allege "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Espinal v. Goord,* 558 F.3d 119, 128 (2d Cir. 2009) (internal quotation marks omitted). Courts are instructed to "approach prisoner retaliation claims with skepticism and particular care, because virtually any adverse action taken against a prisoner by a prison official . . . can be characterized as a constitutionally proscribed retaliatory act." *Davis v. Goord,* 320 F.3d 346, 352 (2d Cir. 2003) (internal quotation marks omitted). Accordingly, First Amendment retaliation claims brought by prisoners must "be 'supported by specific and detailed factual allegations,' not stated 'in wholly conclusory terms.'" *Dolan v. Connolly,* 794 F.3d 290, 295 (2d Cir. 2015) (quoting *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir. 1983), *overruled on other grounds by Swierkiewicz v. Sorema N.A.,* 534 U.S. 506 (2002)).

### a. DeCastro

DeCastro contends that Plaintiff has failed to plausibly state a constitutional claim of retaliation as to either report because Plaintiff has failed establish a causal connection, or provide any factual support, related to DeCastro's alleged "personal vendetta." (Defs.' Mem. in Supp. of

Mot. To Dismiss ("Defs.' Mem.") 11 n.4. (Dkt. No. 47); *see also* Defs.' Reply in Supp. Of Mot. To Dismiss ("Defs.' Reply") 2–5 (Dkt. No. 56).)  The Court agrees.

Plaintiff's allegations regarding DeCastro's retaliation in his Complaint are that he has a "personal vendetta" against Plaintiff and therefore altered Velez's misbehavior report on April 22, 2012 and encouraged Encarnacion to file a report against Plaintiff in April 2013.  (First COA 13; Third COA 3–4.)  However, to the extent Plaintiff alleges in his opposition papers that DeCastro's personal vendetta arises out of Plaintiff's position on the IGRC and Plaintiff's past adverse findings against DeCastro, (*see* Pl.'s Opp'n to Defs.' Mot To Dismiss ("Pl.'s Opp'n") 4 (Dkt. No. 55)), such conduct could, liberally construed, be protected.  *See Dolan*, 794 F.3d at 295 (holding that "retaliation against a prisoner for filing or voicing grievances on behalf of a prison population as a member of an inmate grievance body, such as the [Inmate Liaison Committee], violates the right to petition government for the redress of grievances guaranteed by the First and Fourteenth Amendments." (internal quotation marks omitted)).

However, Plaintiff has failed to allege any facts to support a finding that DeCastro took any adverse action against him, or that that there was a causal connection between the protected speech and the adverse action.  Critically, Plaintiff did not receive either the April 22, 2012 or the April 2013 misbehavior reports from DeCastro.  Rather, the April 2012 report was issued by Velez, (*see* First COA 13), and the April 2013 report was issued by Encarnacion, (*see* Third COA 3–4).  Plaintiff's allegations regarding DeCastro are merely that he "altered/rewrote" the April 2012 report, (First COA 13), but the May 1, 2012 Disposition itself makes clear that to the extent DeCastro was involved it was to provide Plaintiff with a copy of the report on April 23, 2013.  (*See* May 1, 2012 Disposition 23.)  Similarly, Plaintiff alleges that he "do[es] believe [Encarnacion] spoke to . . . DeCastro . . . [who] told . . . Encarnacion . . . to write the false

misbehavior report."  (Third COA 4.)  Each of these accusations is entirely conclusory, as

Plaintiff's belief that DeCastro and Encarnacion colluded to punish him is not the same as a

factual allegation, *see Aho v. Anthony*, 782 F. Supp. 2d 4, 7 (D. Conn. 2011) (dismissing a §

1983 action where "[t]he only allegation with respect to the defendants' personal involvement is

that" defendants were "acting in concert" with each other and others to deprive the plaintiff of

due process); *Malcolm v. Honeoye Falls–Lima Educ. Ass'n,* 678 F. Supp. 2d 100, 107

(W.D.N.Y. 2010) ("The Second Circuit has repeatedly emphasized that '[a] complaint containing

only conclusory, vague or general allegations of conspiracy to deprive a person of constitutional

rights cannot withstand a motion to dismiss'") (quoting *Sommer v. Dixon,* 709 F.2d 173, 175 (2d

Cir. 1983)), and insufficient to establish that DeCastro had any role in the filing of a misbehavior

report.

Moreover, even assuming DeCastro had taken adverse action, Plaintiff has failed to

allege any causal connection between his presence on the IGRC and being issued any

misbehavior reports.  Plaintiff's claim that this created a "personal vendetta," (First COA 13), on

the part of DeCastro is entirely conclusory.  There are no facts that DeCastro was at all motivated

by this alleged vendetta, or had any motive at all beyond Plaintiff's violation of DOCCS

regulations.  *See Vogelfang*, 889 F. Supp. 2d at 517 (S.D.N.Y. 2012) (holding that "repeatedly

assert[ing] that [the plaintiff's] perceived mistreatment is a result of retaliatory animus on the

part of the defendants," without "any specific and detailed factual allegations to support that

assertion," is insufficient to establish a causal connection); *Bouknight v. Shaw*, No. 08-CV-5187,

2009 WL 969932, at *6 (S.D.N.Y. Apr. 6, 2009) (finding plaintiff's allegation that the defendant

"wrote me up for revenge" is "mere speculation" and therefore insufficient to plausibly establish

"the requisite causal connection").  Accordingly, the Motion To Dismiss Plaintiff's retaliation claim against DeCastro is granted.

b.  Encarnacion

As to Encarnacion, Plaintiff alleges he was involved in, and cooperated with, an "investigation" at Woodbourne, and resulted in Encarnacion being "locked out" of the facility for two months.  (Third COA 4.)  The Court will assume for the purpose of this Motion that participation in an investigation of prison officials, akin to filing a grievance against such officials, is constitutionally protected conduct.  *See Graham v. Henderson,* 89 F.3d 75, 80 (2d Cir. 1996) ("This court has held that retaliation against a prisoner for pursuing a grievance violates the right to petition government for the redress of grievances guaranteed by the First and Fourteenth Amendments and is actionable under § 1983."); *Franco v. Kelly,* 854 F.2d 584, 589 (2d Cir. 1988) ("[I]ntentional obstruction of a prisoner's right to seek redress of grievances is precisely the sort of oppression that [§] 1983 is intended to remedy." (internal quotation marks and alterations omitted)).  Moreover, the alleged filing of a false misbehavior report would constitute an adverse action in the retaliation context.  *See Gill v. Pidlypchak*, 389 F.3d 379, 384 (2d Cir. 2004) (holding that "the filing of false misbehavior reports against [the plaintiff] and his sentence of three weeks in keeplock," was sufficient to allege an adverse action, which "would deter a prisoner of ordinary firmness from vindicating his or her constitutional rights through the grievance process and the courts").

Yet, as with DeCastro, Plaintiff has failed to establish any non-conclusory causal connection between that investigation, Plaintiff's participation in that investigation, and Encarnacion's alleged actions.  Specifically, Plaintiff has failed to identify when the investigation took place, or that Encarnacion even knew that Plaintiff was involved in any such

investigation.[4]  In the absence of any allegation that Encarnacion was aware of Plaintiff's

participation in an investigation, *Tirado v. Shutt*, No. 13-CV-2848, 2015 WL 774982, at *10

(S.D.N.Y. Feb. 23, 2015) ("Absent evidence that any defendant knew about his . . . grievance,

[the plaintiff] has failed to provide any basis to believe that they retaliated against him."),

*adopted in relevant part by* 2015 WL 4476027 (S.D.N.Y. July 22, 2015), or that there was any

temporal relationship between the grievance and the disciplinary action, *see Rivera v. Goord*,

119 F. Supp. 2d 327, 341 (S.D.N.Y. 2000) (dismissing retaliation claim where the plaintiff failed

to plausibly allege "temporal proximity between [the] plaintiff's protected activity and [the

defendant's] alleged acts of retaliation"), Plaintiff cannot state a retaliation claim, *see Mateo v.

Dawn*, No. 14-CV-2620, 2016 WL 5478431, at *8 (S.D.N.Y. Sept. 28, 2016) (holding a

plaintiff's failure to allege any knowledge of the protected conduct results in a "fail[ure] to

establish a plausible causal connection" for the purposes of a retaliation claim).  Accordingly, the

Motion To Dismiss Plaintiff's retaliation claim against Encarnacion is granted.

### 3.  Access to Courts Claim

Plaintiff alleges that DeCastro and Clark opened his legal mail without authorization.

(*See* Second COA 35).  According to Plaintiff, DeCastro and Clark justified their actions by

charging Plaintiff with subverting the proper correspondence procedures by sending non-legal

mail to an ex-inmate under the guise of legal mail.  (*See id.* at 35; April 2, 2013 Report 41.)

Plaintiff claims that DeCastro and Clark then conspired to "cover their actions," while Clark

continued to open Plaintiff's legal correspondence outside of his presence.  (*See* Second COA

35–36.)

---

[4] In fact, Plaintiff claims to have spoken "very highly of [Encarnacion]" when speaking
to the investigators, (Third COA at 4), which would belie any claim that Plaintiff's participation
would result in a retaliatory motive on the part of Encarnacion were he to have known of it.

It is well-established that "[a] prisoner has a constitutional right of access to the courts for the purpose of presenting his claims, a right that prison officials cannot unreasonably obstruct and that states have affirmative obligations to assure." *Washington v. James,* 782 F.2d 1134, 1138 (2d Cir. 1986); *see also Bounds v. Smith,* 430 U.S. 817, 821 (1977) ("It is now established beyond doubt that prisoners have a constitutional right of access to the courts."). Relatedly, the Second Circuit has held that "[i]nterference with legal mail implicates a prison inmate's rights to access to the courts and free speech as guaranteed by the First and Fourteenth Amendments to the U.S. Constitution." *Davis*, 320 F.3d at 351. "To state a claim for denial of access to the courts—in this case due to interference with legal mail—a plaintiff must allege that the defendant 'took or was responsible for actions that hindered [a plaintiff's] efforts to pursue a legal claim.'" *Id.* (quoting *Monsky v. Moraghan,* 127 F.3d 243, 247 (2d Cir. 1997)); *see also Rossi v. Stevens,* No. 04-CV-1836, 2008 WL 4452383, at *12 (S.D.N.Y. Sept. 30, 2008) ("[T]o state a valid [§]1983 claim for denial of access to the courts based on interference with an inmate's legal mail, the inmate must satisfy two elements: that the deliberate and malicious interference impeded his/her access to the courts, and that, as a result of that interference, an existing meritorious action was prejudiced—that is, the inmate suffered actual injury."). Moreover, "[w]hile a prisoner has a right to be present when his legal mail is opened, an isolated incident of mail tampering is usually insufficient to establish a constitutional violation." *Id.* (citation omitted).

Here, it is alleged that Clark and DeCastro interfered with what Plaintiff alleges was legal mail on two occasions. (*See* Second COA 35–36.) While "as few as two incidents of mail tampering could constitute an actionable violation (1) if the incidents suggested an ongoing practice of censorship unjustified by a substantial government interest, or (2) if the tampering

unjustifiably chilled the prisoner's right of access to the courts," *Davis*, 320 F.3d at 351, no such circumstances are present here, nor are there "specific allegations of invidious intent or of actual harm," *id.* Plaintiff has put forth purely conclusory allegations of DeCastro's "personal vendetta" as a motivating factor for any and all actions taken against Plaintiff, (*see* First COA 13), and similarly asserted, without detailed allegations, that both Clark and DeCastro "acted in a willful manner . . . to hurt [Plaintiff] with malice," (Second COA 35). Moreover, Plaintiff's pleadings are critically deficient, as he makes no allegations that this interference was part of an "ongoing practice," or that he was "unjustifiably chilled" in seeking access to the courts to prosecute, or defend against, any pending legal action. *Davis*, 320 F.3d at 351; *see also Black v. Petitinato*, No. 16-CV-3941, 2016 WL 3983590, at *7 (E.D.N.Y. July 25, 2016) (dismissing a plaintiff's access to the courts claim based on a "fail[ure] to allege any facts showing that [the] defendant . . . caused actual injury, i.e., that the defendant's actions hindered the plaintiff's efforts to pursue a legal claim." (citation and internal quotation marks omitted); *Smith v. City of New York*, No. 14-CV-443, 2015 WL 1433321, at *3 (S.D.N.Y. Mar. 30, 2015) ("[The p]laintiff must allege facts demonstrating that he was prejudiced in his ongoing legal proceedings. A mere delay in being able to work on one's legal action or communicate with the courts does not rise to the level of a constitutional violation." (internal quotation marks omitted)); *Solana v. NYC Dep't of Corr.*, No. 12-CV-3519, 2012 WL 5466425, at *6 (E.D.N.Y. Nov. 8, 2012) ("[The plaintiff's] assertions that the [prison] has a policy to open legal stamped mail and it has happened many, many times are mere conclusory statements, not facts from which this court could infer a pattern of censorship on the part of the [prison]." (internal quotation marks omitted)). Accordingly, Plaintiff's access to the courts claim is dismissed.

To the extent that Plaintiff alleges a conspiracy claim against Clark and DeCastro arising out of his mail tampering allegations, (*see* Pl.'s Opp'n 10–11), such a claim also fails. Claims for conspiracy to violate civil rights, even if brought under 42 U.S.C. § 1983, "should actually be stated as a claim under [§] 1985, which applies to conspiracies." *Webb v. Goord*, 340 F.3d 105, 110 (2d Cir. 2003). Section 1985(2) "renders actionable (1) a conspiracy[,] (2) for the purpose of impeding, hindering, obstructing, or defeating, in any manner, (3) the due course of justice in any State or Territory, (4) with intent to deny to any citizen the equal protection of the laws, or to injure him or his property for lawfully enforcing, or attempting to enforce, the right of any person, or class of persons, to the equal protection of the laws." *Rodriguez v. City of N.Y.*, No. 05-CV-10682, 2008 WL 4410089, at *15 (S.D.N.Y. Sept. 25, 2008). "Title 42 U.S.C. § 1985(3) prohibits, in pertinent part, conspiracies undertaken 'for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges or immunities under the laws.'" *Jews for Jesus, Inc. v. Jewish Cmty. Relations Council of N.Y., Inc.*, 968 F.2d 286, 290 (2d Cir. 1992) (quoting 42 U.S.C. § 1985(3)). "The elements of a claim under § 1985(3) are: (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of equal protection of the laws, . . . ; (3) an act in furtherance of the conspiracy; (4) whereby a person is . . . deprived of any right of a citizen of the United States." *Brown v. City of Oneonta*, 221 F.3d 329, 341 (2d Cir. 2000) (alterations in original) (internal quotation marks omitted); *see also Turkmen v. Hasty*, 789 F.3d 218, 262 (2d Cir. 2015) (same), *judgment rev'd in part, vacated in part on other grounds sub nom. Ziglar v. Abbasi*, 137 S.Ct. 1843 (2017).

Both claims "require a showing of class-based invidiously discriminatory animus" on the part of the conspiring parties, *Hickey v. City of N.Y.*, No. 01-CV-6506, 2004 WL 2724079, at *22

(S.D.N.Y. Nov. 29, 2004), *aff'd*, 173 F. App'x 893 (2d Cir. 2006), as well as "some factual basis supporting a meeting of the minds, such that [the] defendants entered into an agreement, express or tacit, to achieve the unlawful end." *Webb*, 340 F.3d at 110 (internal quotation marks omitted). Plaintiff does not allege "some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind [Defendant's] action[s]," *Turkmen*, 789 F.3d at 262, nor does he provide any specific facts to plausibly suggest that DeCastro and Clark "entered into an agreement, express or tacit, to achieve [an] unlawful end," *Webb*, 340 F.3d at 110. Instead, Plaintiff merely states that DeCastro and Clark "conspired against [him]" and had a "meeting of the minds." (Second COA at 35.) Such vague and conclusory allegations of conspiracy are insufficient, and therefore must be dismissed. *See Lastra v. Barnes and Noble Bookstore*, No. 11-CV-2173, 2012 WL 12876, at *7 (S.D.N.Y. January 3, 2012) (noting that "[u]nsubstantiated, conclusory, vague[,] or general allegations of a conspiracy" are insufficient to state a claim under § 1985); *Van Dunk v. St. Lawrence*, 604 F. Supp. 2d 654, 663 (S.D.N.Y. 2009) ("[C]laims of conspiracy that are vague and provide no basis in fact must be dismissed." (internal quotation marks omitted)).

### 4. Eighth Amendment Claims

Upon his transfer to Great Meadow, Plaintiff alleges that he was subjected to cruel and unusual conditions of confinement by way of LaChance's, and several unnamed "B1–SHU Officials[']," failure to clean up a blood spill in the showers, (Fifth COA 19 –20), and Lindstrand and several unnamed officials at Great Meadow inability to eradicate birds from the mess hall, (*see* Sixth COA 6).[5]

---

[5] In his Sixth COA, Plaintiff names "J. Shusda" as a Defendant given his role as the Food Service Administrator at Great Meadow. However, this individual has never been listed as a Defendant on Plaintiff's prison form complaint, has not been listed in the case caption on ECF,

"The conditions of a prisoner's confinement can give rise to an Eighth Amendment violation." *Phelps v. Kapnolas*, 308 F.3d 180, 185 (2d Cir. 2002). "In such cases, a prisoner may prevail only where he proves both an objective element—that the prison officials' transgression was 'sufficiently serious'—and a subjective element—that the officials acted, or omitted to act, with a 'sufficiently culpable state of mind,' i.e., with 'deliberate indifference to inmate health or safety.'" *Id.* (italics omitted) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). Under the "objective" requirement, a plaintiff must show that "the conditions, either alone or in combination, pose an unreasonable risk of serious damage to [an inmate's] health," which can be satisfied if an inmate is deprived of "basic human needs such as food, clothing, medical care, and safe and sanitary living conditions." *Walker v. Schult*, 717 F.3d 119, 125 (2d Cir. 2013) (internal quotation marks omitted). "[T]o establish the objective element of an Eight[h] Amendment claim, a prisoner must prove that the conditions of his confinement violate contemporary standards of decency." *Phelps*, 308 F.3d at 185.

Under the "subjective" requirement, a defendant "'cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" *Id.* at 185–86 (quoting *Farmer*, 511 U.S. at 837). "A prison official may be found to have had a sufficiently culpable state of mind if he participated directly in the alleged event, or learned of the inmate's complaint and failed to remedy it, or created or permitted a policy that harmed the inmate, or acted with gross negligence

_____

has not been issued a summons, and has not been served. Accordingly, the Court will not address any claims made against J. Shusda at this time.

in managing subordinates." *Gaston v. Coughlin*, 249 F.3d 156, 164 (2d Cir. 2001); *see also Abdur-Raheem*, 2015 WL 667528, at *4 (same); *Reid v. Nassau Cty. Sheriff's Dep't*, No. 13-CV-1192, 2014 WL 4185195, at *17 (E.D.N.Y. Aug. 20, 2014) (same).

Assuming, without deciding, that Plaintiff has satisfied the objective prong regarding the pool of blood left in the shower, no such claim would lie regarding the allegations surrounding the birds in the mess hall area. *See, e.g.*, *Phillips v. LaValley*, No. 12-CV-609, 2014 WL 1202693, at *12 (N.D.N.Y. Mar. 24, 2014) (finding that an inmates' food tray being "contaminated" with a cockroach poses a condition that is "insufficiently serious to sustain an Eighth Amendment conditions of confinement claim"); *Mitchell v. Goord*, No. 04-CV-366, 2007 WL 189087, at *5 (N.D.N.Y. Jan. 22, 2007) (holding that allegations of, inter alia, an "infestation by vermin, insects, rats, and mice" does not rise to the level of an Eighth Amendment violation); *Govan v. Campbell*, 289 F. Supp. 2d 289, 296–97 (N.D.N.Y. 2003) (permitting, inter alia, "wild birds . . . to fly within the cells . . . do[es] not rise to the level of a constitutional violation").

However, irrespective of whether Plaintiff has met the substantive pleading standards for an Eighth Amendment claim, nothing in Plaintiff's Complaint suggests that either LaChance or Lindstrand, the only named Great Meadow Defendants, was directly or indirectly involved in creating a dangerous or inhumane environment for Plaintiff. The Second Circuit has made clear that, "[p]roof of an individual defendant's personal involvement in the alleged wrong is, of course, a prerequisite to his liability on a claim for damages under § 1983." *Gaston*, 249 F.3d at 164. "It is well settled that, in order to establish a defendant's individual liability in a suit brought under § 1983, a plaintiff must show . . . the defendant's personal involvement in the alleged constitutional deprivation." *Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir.

2013).  To establish personal involvement, a plaintiff must show that:

> (1) the defendant participated directly in the alleged constitutional violation[;] (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong[;] (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom[;] (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts[;] or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Id.* at 139 (alterations, italics, and internal quotation marks omitted).  In other words, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."  *Iqbal*, 556 U.S. at 676.

Here, Plaintiff makes no allegations in his Complaint that any Defendant actually knew of the alleged conditions, let alone participated in their creation.  *See Wright*, 21 F.3d at 501 (finding no personal involvement when the defendant "was never put on actual or constructive notice of the [rule] violation," did not "create[] a policy or custom under which the violation occurred," and did not "act[] negligently in managing subordinates who caused the violation").  Instead, he alleges that it was LaChance's "responsibility to close the shower area, call for a blood[]spill clean up crew [] [a]nd have the shower area sanitize[d]," (Fifth COA 19), and that Lindstrand "is legally responsible for the food operation/overall welfare of all the offenders at Great Meadow," (Sixth COA at 5).  However, LaChance and Lindstrand cannot be held personally liable for constitutional violations merely "because [t]he[y] [are] in a . . . position of authority" at Great Meadow.  *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994).  Plaintiff does not plausibly allege that either of these individuals failed to "act on information regarding the [allegedly] unlawful conduct" or otherwise acted with "gross negligence."  *Reid*, 2014 WL

4185195, at *12 (quoting *Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 753 (2d Cir. 2003)).[6]

Therefore, because the Complaint fails to allege that any Defendant was "aware of facts from which the inference could be drawn that" the conditions at Great Meadow specifically posed a substantial risk of serious harm to Plaintiff, or that Defendants in fact drew such an inference, *Farmer*, 511 U S. at 837, the Court dismisses Plaintiff's Eighth Amendment claims.[7]

## III. Conclusion

For the foregoing reasons, Defendants' Motion To Dismiss is granted. However, because this is the first adjudication of Plaintiff's claims on the merits, the dismissal is without prejudice. If Plaintiff wishes to file an amended complaint, Plaintiff should include within that amended complaint any changes to correct the deficiencies identified in this Opinion that Plaintiff wishes the Court to consider. The amended complaint will replace, not supplement, the original complaint. The amended complaint must contain *all* of the claims and factual allegations Plaintiff wishes the Court to consider. The Court will not consider factual allegations contained in supplemental letters, declarations, or memoranda. If Plaintiff fails to abide by the 30-day deadline, this Action may be dismissed with prejudice.

---

[6] Specifically, Plaintiff makes no allegation that LaChance knew of any blood spill in the showers, let alone that the amount of blood was significant or came from someone with HIV. As Defendants rightly note, Plaintiff himself did not even notice the blood during the duration of his shower, (*see* Fifth COA 19), and thus it is implausible that LaChance would have known without prompting from Plaintiff or any other individual in the area. Moreover, Plaintiff merely names Lindstrand as responsible for supervision at Great Meadow, but makes no further allegations that Lindstrand was ever made aware of any unsanitary conditions. (*See* Sixth COA 5–11.)

[7] To the extent Plaintiff seeks injunctive relief regarding the mess hall conditions at Great Meadow, such relief would be moot given Plaintiff's release from the facility. *See Salahuddin v. Goord*, 467 F.3d 263, 272 (2d Cir. 2006) ("[A]n inmate's transfer from a prison facility generally moots claims for declaratory and injunctive relief against officials of that facility."); *Pugh v. Goord*, 571 F. Supp. 2d 477, 489 (S.D.N.Y. 2008) (explaining that "[w]here a prisoner has been released from prison, his [or her] claims for injunctive relief based on the conditions of his [or her] incarceration must be dismissed as moot" (italics omitted)).

The Clerk of the Court is respectfully requested to terminate the pending motion, (Dkt. No. 46), and to mail a copy of this Opinion to Plaintiff.

SO ORDERED.

DATED:     March 13, 2018
           White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE