UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

BERNARD THOMAS,

Plaintiff,

v.

LIEUTENANT DECASTRO, *et al.*,

Defendants.

No. 14-CV-6409 (KMK)

OPINION & ORDER

<u>Appearances</u>:

Bernard Thomas
New York, NY
*Pro Se Plaintiff*

Kristin R. Vogel, Esq.
New York State Office of the Attorney General
New York, NY
*Counsel for Defendants*

KENNETH M. KARAS, District Judge:

Bernard Thomas ("Plaintiff") brings this pro se Action, pursuant to 42 U.S.C. § 1983,

against Lieutenant John DeCastro ("DeCastro"), Deputy Superintendent of Security Timothy

Humphrey ("Humphrey"), Deputy Superintendent for Programs Jean King ("King"), Lieutenant

Steven Katz ("Katz"), Correction Officer Damian Velez ("Velez"), Brenda Clark ("Clark"),

Imam Samuel Encarnacion ("Encarnacion"), and Director of Special Housing Albert Prack

("Prack") (collectively, "Defendants").[1]  Plaintiff alleges that, while incarcerated at Woodbourne

---

[1] The Amended Complaint does not name or refer to three Defendants — Correction
Officer J. LaChance, Deputy Superintendent of Administration Jeffrey Lindstrand, and Director
Donald Venettozzi — who were named in the original Complaint.  Accordingly, all claims
against these Defendants are dismissed.

Correctional Facility ("Woodbourne"), Defendants violated his rights under the First and Fourteenth Amendments by issuing him false misbehavior reports and subsequently subjecting him to retaliatory disciplinary hearings. (*See* Am. Compl. (Dkt. No. 70).) On March 13, 2018, the Court issued an Opinion & Order (the "Opinion") granting an earlier motion to dismiss filed by Defendants. (*See* Opinion (Dkt. No. 59).) Before the Court is Defendants' Motion To Dismiss the Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) (the "Motion"). (Not. of Mot. (Dkt. No. 74).) For the reasons described herein, Defendants' Motion is granted in part and denied in part.

## I. Background

### A. Factual History

The following facts are drawn from Plaintiff's Amended Complaint and attached exhibits and are taken as true for the purpose of resolving the instant Motion.

#### 1. Plaintiff's Relationship with DeCastro

While at Woodbourne, Plaintiff was elected to be an inmate representative on the Inmate Grievance Resolution Committee (the "IGRC"), a position he held for about five years. (*Id.* at 11–12, 35, 40, 44, 54.)[2] During this time, Plaintiff had numerous interactions and disagreements with DeCastro, a lieutenant, regarding "false grievances that [were] filed against DeCastro," causing DeCastro to have a "personal vendetta" against him. (*Id.*) In particular, Plaintiff alleges that DeCastro "use[d] to threaten [him]" by saying that Plaintiff was "on the 'burn,' meaning watch [your] back," (*id.* at 12), and by authorizing "unwarrant[ed] cell searches," (*id.* at 35).

---

[2] Plaintiff's filings do not use consistent page numbering. For ease of reference, the Court cites to the ECF-generated page numbers stamped at the top of each page.

### 2. First Misbehavior Report and First Disciplinary Hearing

On April 22, 2012, Velez, a correction officer, issued Plaintiff a misbehavior report (the "First Report") claiming that Plaintiff had violated certain disciplinary rules against creating a disturbance, interfering with employees, refusing a direct order, and moving in the facility contrary to procedure. (Am. Compl. 11, 18–19, 21.) Plaintiff alleges that the First Report was false, (*id.* at 11), and that it was "inadequate" because it was "not clear what the charges were," (*id.*). The next day, DeCastro "reviewed" the First Report. (*Id.*) Plaintiff alleges that, given his history with DeCastro, he "changed the status" of the First Report, thereby denying Plaintiff adequate notice of the charges against him as required under 7 N.Y.C.R.R. § 251-3. (*Id.* at 12–16, 21.)

A disciplinary hearing regarding the First Report was held on May 1, 2012 (the "First Hearing"), at which Humphrey served as the presiding officer. (*Id.* at 13, 21, 23.) Given the alleged notice problems, Humphrey was "suppo[sed] to adjourn the hearing to give . . . Plaintiff an opportunity to prepare for his defense." (*Id.* at 13.) Yet, Humphrey failed to rectify the error, thereby "prejudic[ing]" Plaintiff's ability to present a defense. (*Id.* at 13–14.) Humphrey found Plaintiff guilty of three charges and sentenced him to 45 days in keeplock and loss of other privileges, including the loss of recreation, packages, commissary, and access to the telephone. (*Id.* at 14, 21.) Plaintiff appealed Humphrey's decision to Prack, the Director of Special Housing, but Prack allegedly "rubber-stamped" the decision and denied the appeal. (*Id.* at 14, 23.) Plaintiff ultimately served 10 days of his 45-day sentence. (*Id.* at 21.)

### 3. Second Misbehavior Report and Second Disciplinary Hearing

Plaintiff alleges that DeCastro and Clark, a senior mail clerk, "conspired" to intentionally interfere with and open Plaintiff's outgoing and incoming "privileged" and "legal"

correspondence outside of his presence. (*Id.* at 24, 26–27.) DeCastro then issued Plaintiff a false and retaliatory misbehavior report (the "Second Report"), charging him with violating rules on correspondence, smuggling, and property damage. (*See id.* at 25, 30, 32.)[3] Plaintiff alleges that DeCastro issued the Second Report to "cover their actions" and to get Plaintiff "fired" from his IGRC position and transferred to another facility. (*Id.* at 25, 35.)

A disciplinary hearing regarding the Second Report was held between April 4 and 8, 2013 (the "Second Hearing"), at which King, a lieutenant, served as the presiding officer. (*Id.* at 32.) Plaintiff was found guilty of the charges and sentenced to three months of keeplock and lost privileges. (*Id.*) Moreover, King removed Plaintiff from his IGRC position. (*Id.* at 32, 54.) Plaintiff appealed, and Prack reversed King's decision on July 2, 2013. (*Id.* at 25–26, 34.) In Plaintiff's view, the reversal "shows [that he] was telling the truth" and that DeCastro and Clark were "lying." (*Id.* at 26, 37.)

Plaintiff further alleges that King, in removing Plaintiff from his position as an IGRC representative, did not comply with DOCCS Directive 4040, which, according to Plaintiff, prohibits an IGRC representative from being removed from his position without a prior hearing. (*Id.* at 49–50.) In particular, Plaintiff alleges that, because the Second Hearing addressed an issue unrelated to his IGRC position, it did not satisfy the requirements of the directive. (*Id.*)

### 4. Third Misbehavior Report and Third Disciplinary Hearing

On April 24, 2013, Plaintiff sought to speak to Encarnacion, the Imam at Woodbourne, because he was having "mental issues" and wanted to discuss "serious family matters." (*Id.* at 37–38, 70.) Encarnacion came to visit Plaintiff that same day, where he proceeded to yell at

---

[3] The misbehavior report states that Plaintiff marked an outgoing letter as legal mail when it in fact was addressed to an ex-inmate and contained no legal documents. (Am. Compl. 30.)

Plaintiff. (*Id.*) Plaintiff thereafter received an allegedly false and retaliatory misbehavior report (the "Third Report"), charging him with making threats to Encarnacion. (*Id.* at 38, 78.) Plaintiff alleges that Encarnacion retaliated against him because he thought that Muslims at Woodbourne had "flipped/sold him out and got him locked out" of the facility. (*Id.* at 70–71.) Plaintiff further alleges that DeCastro, who "was reviewing all [Plaintiff's] misbehavior reports" and was seeking to make sure future misbehavior reports did not get reversed like the Second Report, had Encarnacion issue the Third Report. (*Id.* at 38–39, 71.)

A disciplinary hearing regarding the Third Report was held between April 29 and May 7, 2013 (the "Third Hearing"), at which King served as the presiding officer. (*Id.* at 78.) Plaintiff alleges that King was biased and prejudiced against him and that there was no evidence that he threatened Encarnacion. (*Id.* at 39, 72.) King found Plaintiff guilty and sentenced him to 60 days in the special housing unit ("SHU"). (*Id.* at 72, 78.) Plaintiff appealed, and the appeal was affirmed by Venettozzi. (*Id.*)

Plaintiff further alleges that on May 8, 2013, Katz, a lieutenant, forged and rewrote King's decision following the Third Hearing decision without authority. (*Id.* at 73.) Katz allegedly corrected King's decision by having Plaintiff's confinement in SHU commence immediately, rather than having it start following the completion of Plaintiff's keeplock sentence. (*Id.* at 73–75.) Plaintiff claims that this confusion regarding his sentences resulted in him spending extra days in SHU. (*Id.*)

B.  Procedural History

Plaintiff filed his initial Complaint and attached exhibits on August 5, 2014. (Dkt. No. 2.) The Court granted Plaintiff's IFP request on November 18, 2014. (Dkt. No. 4.) On March 7, 2017, Defendants filed a letter requesting permission to file an initial motion to dismiss. (Dkt.

No. 39.)  The Court set a briefing schedule, (Dkt. No. 40), and the Parties thereafter briefed the motion.  (Dkt. Nos. 46, 47, 54, 55, 56.)

On March 13, 2018, the Court issued an Opinion granting Defendants' initial motion. (Opinion (Dkt. No. 59).)  The Court dismissed the Complaint without prejudice and directed Plaintiff to file an amended complaint correcting the deficiencies identified.  (*Id.* at 33.)

On May 15, 2018, Plaintiff filed the instant Amended Complaint.  (Dkt. No. 70.)  On May 29, 2018, Defendants filed a letter seeking a motion in anticipation of moving to dismiss. (Dkt. No. 71.)  Plaintiff filed a letter in opposition.  (Dkt. No. 72.)  On June 11, 2018, the Court set a briefing schedule.  (Dkt. No. 73.)  Defendants filed the instant Motion To Dismiss and accompanying papers on July 11, 2018.  (Not. of Mot.; Mem. of Law in Supp. of Mot. ("Defs.' Mem.") (Dkt. No. 75).)  On August 14, 2018, Plaintiff filed his response in opposition to the Motion.  (Pl.'s Resp. to Defs.' Mot. ("Pl.'s Mem.") (Dkt. No. 77).)  On August 23, 2018, Defendants filed a reply.  (Reply Mem. of Law in Supp. of Mot. ("Defs.' Reply") (Dkt. No. 78).)

## II. Discussion

Defendants move to dismiss the Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) on grounds that it fails to correct the deficiencies identified in the Court's prior Opinion.  (Defs.' Mem. 1.)  In particular, Defendants argue that Plaintiff fails to state a due process claim, fails to state a First Amendment retaliation or access-to-courts claim, and fails to state a conspiracy claim.  (*Id.* at 8–15.)  In addition, Defendants argue that they are entitled to qualified immunity on Plaintiff's retaliation claim.  (*Id.* at 16–17.)  The Court addresses each argument separately to the extent necessary.

A.  Standard of Review

The Supreme Court has held that, while a complaint "does not need detailed factual allegations" to survive a motion to dismiss, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations, quotation marks, and alterations omitted).  Indeed, Rule 8 of the Federal Rules of Civil Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Id.* (quotation marks and alteration omitted).  Rather, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.  Although "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563, and a plaintiff need allege "only enough facts to state a claim to relief that is plausible on its face," *id.* at 570, if a plaintiff has not "nudged [his or her] claim[] across the line from conceivable to plausible, the[] complaint must be dismissed," *id.*; *see also Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.  But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged — but it has not 'show[n]' — 'that the pleader is entitled to relief.'" (citation omitted) (second alteration in original) (quoting Fed. R. Civ. P. 8(a)(2))); *id.* at 678–79 ("Rule 8 marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

In considering a motion to dismiss, the Court "must accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam); *see also Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014) ("In addressing the sufficiency of a complaint we accept as true all factual allegations . . . ." (quotation marks omitted)). Further, "[f]or the purpose of resolving [a] motion to dismiss, the Court . . . draw[s] all reasonable inferences in favor of the plaintiff." *Daniel v. T & M Prot. Res., Inc.*, 992 F. Supp. 2d 302, 304 n.1 (S.D.N.Y. 2014) (citing *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012)). Where, as here, a plaintiff proceeds pro se, the "complaint[] must be construed liberally and interpreted to raise the strongest arguments that [it] suggest[s]." *Sykes v. Bank of Am.*, 723 F.3d 399, 403 (2d Cir. 2013) (per curiam) (quotation marks omitted). However, "the liberal treatment afforded to pro se litigants does not exempt a pro se party from compliance with relevant rules of procedural and substantive law." *Bell v. Jendell*, 980 F. Supp. 2d 555, 559 (S.D.N.Y. 2013) (quotation marks omitted); *see also Caidor v. Onondaga County*, 517 F.3d 601, 605 (2d Cir. 2008) ("[P]ro se litigants generally are required to inform themselves regarding procedural rules and to comply with them." (italics and quotation marks omitted)).

Generally, "[i]n adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Leonard F. v. Isr. Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) (quotation marks and citation omitted). When a plaintiff proceeds pro se, however, the Court may consider "materials outside the complaint to the extent that they are consistent with the allegations in the complaint," *Alsaifullah v. Furco*, No. 12-CV-2907, 2013 WL 3972514, at *4 n.3 (S.D.N.Y. Aug. 2, 2013) (quotation marks omitted), including, as relevant here, "documents that a pro se litigant

attaches to his opposition papers," *Agu v. Rhea*, No. 09-CV-4732, 2010 WL 5186839, at *4 n.6 (E.D.N.Y. Dec. 15, 2010) (italics omitted).

B. Analysis

1. Procedural Due Process Claims

A prison inmate "has the right not to be deprived of a protected liberty interest without due process of law." *Freeman v. Rideout*, 808 F.2d 949, 951 (2d Cir. 1986). "[T]o present a [procedural] due process claim, a plaintiff must establish (1) that he possessed a liberty interest and (2) that the defendant(s) deprived him of that interest as a result of insufficient process." *Ortiz v. McBride*, 380 F.3d 649, 654 (2d Cir. 2004) (citation and quotation marks omitted). "The appropriate process depends on the balancing of three factors: (1) 'the private interest that will be affected by the official action;' (2) 'the risk of erroneous deprivation of such interest through the procedures used;' and (3) 'the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.'" *Panzella v. Sposato*, 863 F.3d 210, 218 (2d Cir. 2017) (quoting *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)).

The Supreme Court has held that inmates retain due process rights in prison disciplinary proceedings. *See Wolff v. McDonnell*, 418 U.S. 539, 563–72 (1974) (describing procedural protections inmates are to receive when subject to significant disciplinary punishment). However, "[p]rison discipline implicates a liberty interest [only] when it 'imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.'" *Ortiz*, 380 F.3d at 654 (quoting *Sandin v. Conner*, 515 U.S. 472, 484 (1995)). The Second Circuit has explained that "[t]he length of disciplinary confinement is one of the guiding factors in applying *Sandin*'s atypical and significant hardship test." *Hanrahan v. Doling*, 331 F.3d 93, 97 (2d Cir.

2003) (citation and quotation marks omitted). The duration of disciplinary confinement, however, is "not the only relevant factor," and the Second Circuit has "explicitly avoided a bright line rule that a certain period of SHU confinement automatically fails to implicate due process rights." *Palmer v. Richards*, 364 F.3d 60, 64 (2d Cir. 2004). Indeed, "[t]he conditions of confinement are a distinct and equally important consideration in determining whether a confinement in SHU rises to the level of atypical and severe hardship," and, therefore, courts should consider "the extent to which the conditions of the disciplinary segregation differ from other routine prison conditions." *Id.* (citations and quotation marks omitted).

As a guidepost to determining whether due process protections are required in the prison context, the Second Circuit has instructed that, "[w]here the plaintiff was confined for an intermediate duration — between 101 and 305 days — development of a detailed record of the conditions of the confinement relative to ordinary prison conditions is required." *Id.* at 64–65 (citation and quotation marks omitted); *see also Abdur-Raheem v. Caffery*, No. 13-CV-6315, 2015 WL 667528, at *5 (S.D.N.Y. Feb. 17, 2015) (same). Moreover, "although shorter confinements under normal SHU conditions may not implicate a prisoner's liberty interest, [the Second Circuit has] explicitly noted that SHU confinements of fewer than 101 days could constitute atypical and significant hardships if the conditions were more severe than the normal SHU conditions . . . or a more fully developed record showed that even relatively brief confinements under normal SHU conditions were, in fact, atypical." *Palmer*, 364 F.3d at 65 (citations omitted). Indeed, "[a]bsent a detailed factual record, courts typically affirm dismissals of due process claims where the period of time spent in SHU was short — *e.g.*, thirty days — and there was no indication of unusual conditions." *Houston v. Cotter*, 7 F. Supp. 3d 283, 298 (E.D.N.Y. 2014) (citing *Palmer*, 364 F.3d at 66).

Regarding the process an inmate is due, a disciplinary hearing comports with due process requirements where an inmate receives "advance written notice of the charges; a fair and impartial hearing officer; a reasonable opportunity to call witnesses and present documentary evidence; and a written statement of the disposition, including supporting facts and reasons for the action taken." *Luna v. Pico*, 356 F.3d 481, 487 (2d Cir. 2004) (citation omitted). "In the context of prison disciplinary hearings, the Second Circuit has said that its 'conception of an impartial decisionmaker is one who, *inter alia*, does not prejudge the evidence and who cannot say, with . . . utter certainty . . . , how he would assess evidence he has not yet seen.'" *Rahman v. Acevedo*, No. 08-CV-4368, 2011 WL 6028212, at *7 (S.D.N.Y. Dec. 5, 2011) (quoting *Patterson v. Coughlin*, 905 F.2d 564, 570 (2d Cir. 1990)).

Applying these principles, to make out a due process claim related to his confinements in keeplock and SHU, Plaintiff must plausibly allege (1) that there was a deprivation of a protected liberty interest and (2) that such deprivation was the result of the procedural defects. *See Ortiz*, 380 F.3d at 654. Here, as with the initial Complaint, (*see* Opinion 14–17), the first element of Plaintiff's due process claim has not been met as to any of the disciplinary actions. Following the First Report and First Hearing, Plaintiff was sentenced to 45 days in keeplock, although he served only 10 days, with the remaining time suspended. (Am. Compl. 14, 21, 23.) Following the Second Report and Second Hearing, Plaintiff was sentenced to 90 days in keeplock, but served only 30 days, with the remaining time suspended. (*Id.* at 32.) And following the Third Report and Third Hearing, Plaintiff was sentenced to, and served, 60 days in the SHU. (*Id.* at 72, 78.)[4] Because each of Plaintiff's separate segregated confinements was fewer than 101 days,

___

[4] Plaintiff additionally alleges that Katz's rewriting of King's decision on the Third Report caused him to spend additional days in SHU than he otherwise would have. (Am. Compl.

they do not implicate Plaintiff's liberty interest absent a showing that Plaintiff suffered an "atypical and significant hardship." *Palmer*, 364 F.3d at 65. Plaintiff has failed, as he did previously, to show that he suffered any atypical and significant hardship.[5] The Amended Complaint is devoid of *any* allegations regarding the conditions of his keeplock or SHU confinement. The only details provided by Plaintiff regarding this period are that he was deprived of access to recreation, telephone, packages, and commissary. (Am. Compl. 21, 32, 78.) While the Second Circuit has declined to "delineate the precise contours of 'normal' SHU confinement . . . it is sufficient to note that, ordinarily, SHU prisoners are kept in solitary confinement for twenty-three hours a day, provided one hour of exercise in the prison yard per day, and permitted two showers per week." *Ortiz*, 380 F.3d at 655 (citation omitted). Plaintiff makes no allegations that he was kept in keeplock or SHU for longer than the typical period, or that he was denied exercise, adequate showers, or was generally subjected to any conditions that were "more onerous than usual," *Davis v. Barrett*, 576 F.3d 129, 133 (2d Cir. 2009) (citation omitted), and in fact makes no allegations about the conditions of his keeplock beyond the withholding of privileges as described, *see Branch v. Goord,* No. 05-CV-6495, 2006 WL 2807168, at *4 (S.D.N.Y. Sept. 28, 2006) ("Plaintiff's privileges were withheld during confinement, but lost privileges do not constitute an atypical and significant hardship because they are within the expected parameters of the sentence imposed by a court of law." (citation and quotation marks omitted)).

---

73–75.) It is not clear how much extra time Plaintiff served, but Plaintiff alleges he was ultimately released on August 30, 2013. (*Id.*)

[5] Indeed, as Defendants point out, a substantial portion of Plaintiff's due process allegations in the Amended Complaint appear on "the identical type-written document" used "in his original Complaint," (Defs.' Mem. 8), and previously held insufficient by the Court, (Opinion 14–17).

Therefore, because Plaintiff has not shown that his confinement "impose[d] [an] atypical and significant hardship on [him] in relation to the ordinary incidents of prison life," *Hanrahan*, 331 F.3d at 97 (quoting *Sandin*, 515 U.S. at 484), Plaintiff has "failed to demonstrate a liberty interest entitling [him] to due process," *Vogelfang v. Capra*, 889 F. Supp. 2d 489, 511 (S.D.N.Y. 2012). Accordingly, the Court grants the Motion To Dismiss Plaintiff's due process claims as to all Defendants. *See Gaines v. City of New York*, No. 14-CV-6403, 2016 WL 951580, at *3 (S.D.N.Y. Mar. 9, 2016) (dismissing procedural due process claim where the plaintiff did "not allege any facts regarding the conditions of his confinement to suggest that it imposed 'atypical and significant hardship'"); *Acevedo v. Fischer*, No. 12-CV-6866, 2014 WL 5015470, at *15 (S.D.N.Y. Sept. 29, 2014) (collecting cases and noting that courts "have dismissed claims in which [the] plaintiffs alleged spending between forty and fifty days in punitive segregation or faced other comparable discipline" where, "in the absence of some allegation that the conditions of keeplock or SHU confinement were in some way unusual," there is no "violation of a protected liberty interest" (quotation marks omitted)); *O'Diah v. Artus*, No. 10-CV-6705, 2013 WL 1681834, at *2–3 (W.D.N.Y. Apr. 17, 2013) (dismissing case where the plaintiff, confined for 111 days, "failed to allege facts showing that the conditions of his confinement, combined with the duration of his confinement, created an atypical and significant hardship" (quotation marks omitted)); *Edwards v. Horn*, No. 10-CV-6194, 2012 WL 760172, at *10 (S.D.N.Y. Mar. 8, 2012) (explaining that "[s]everal courts have concluded that, absent unusual conditions, 30 days of segregation is not an atypical or significant hardship under *Sandin*" (collecting cases)); *Torres v. Logan*, No. 10-CV-6951, 2011 WL 1811003, at *4 (S.D.N.Y. May 11, 2011) (dismissing the plaintiff's due process claim where he alleged that he was confined for "a little over two-thirds of the 90 days sentence," because the plaintiff "fail[ed] to allege any facts

regarding the conditions of his confinement, including whether they were abnormal or unusual" (alteration and quotation marks omitted)), *adopted by* 2011 WL 3894386 (S.D.N.Y. June 13, 2011).[6]

## 2. Access to Courts Claim

"To state a claim for denial of access to the courts — in this case due to interference with legal mail — a plaintiff must allege that the defendant took or was responsible for actions that hindered a plaintiff's efforts to pursue a legal claim." *Davis v. Goord*, 320 F.3d 346, 351 (2d Cir. 2003) (citation, alteration, and quotation marks omitted). "[A] plaintiff must allege not only that the defendant's alleged conduct was deliberate and malicious, but also that the defendant's actions resulted in *actual injury* to the plaintiff such as the dismissal of an otherwise meritorious legal claim." *Cancel v. Goord*, No. 00-CV-2042, 2001 WL 303713, at *4 (S.D.N.Y. Mar. 29, 2001) (emphasis added) (citing *Lewis v. Casey*, 518 U.S. 343, 351 (1996)). Actual injury includes "claims that systemic official action frustrates a plaintiff . . . in preparing and filing suits at the present time," and "claims not in aid of a class of suits yet to be litigated, but of specific cases that cannot now be tried (or tried with all material evidence), no matter what official action may be in the future." *Christopher v. Harbury*, 536 U.S. 403, 413–14 (2002) (collecting

_____

[6] To the extent the Amended Complaint alleges, as did the initial Complaint, that Plaintiff's removal from his IGRC position without being afforded the process provided for in DOCCS regulations constitutes a procedural due process violation, (Am. Compl. 49–50), that claim fails. The Court previously held that it "is unaware of any cases finding that there is a protected liberty interest in serving as an IGRC representative; indeed other courts within the Second Circuit have found to the contrary." (Opinion 17–18 (collecting cases).) The Court further held that, even assuming a liberty interest in an IGRC position exists, Defendants would be entitled to qualified immunity because "the failure to inform Plaintiff of the possible *punishments* he was subject to . . . has not been clearly established by either the Supreme Court or the Second Circuit" and because "[n]o Supreme Court or Second Circuit case involving a prisoner's removal from the IGRC has held that due process rights adhere to such removal." (*Id.* at 18–20.)

examples within each category).  "A hypothetical injury is not sufficient to state a claim for violation of the right of access to the courts." *Amaker v. Haponik*, No. 98-CV-2663, 1999 WL 76798, at *3 (S.D.N.Y. Feb. 17, 1999).

Here, Plaintiff alleges that DeCastro and Clark "conspired" to interfere with and open Plaintiff's outgoing and incoming "privileged correspondence" outside of his presence.  (Am. Compl. 24, 26–27.)  Even assuming Defendants "alleged conduct was deliberate and malicious," *Cancel*, 2001 WL 303713, at *4, Plaintiff makes no showing of actual injury.  "Mere delay in being able to work on one's legal action or communicate with the courts does not rise to the level of a constitutional violation." *Davis*, 320 F.3d at 352 (citation and quotation marks omitted).  Plaintiff does not allege that he was prevented (or even delayed) from making legal filings.  As before, (*see* Opinion 27), there is no indication that any Defendant "obstruct[ed] [Plaintiff's] legitimate efforts to seek judicial redress" or otherwise prejudiced Plaintiff's legal actions. *City of New York v. Beretta U.S.A. Corp.*, 524 F.3d 384, 397 (2d Cir. 2008) (citation and quotation marks omitted); *see also Christopher*, 536 U.S. at 413 (noting right-of-access concerns are implicated when "systemic official action frustrates a plaintiff . . . in preparing and filing suits at the present time").  Accordingly, Plaintiff's access-to-courts claim is dismissed. *See Tutora v. Gessner*, No. 17-CV-9517, 2019 WL 1382812, at *5 (S.D.N.Y. Mar. 27, 2019) (collecting cases for the proposition that an access-to-courts claim must be dismissed where no showing of actual injury is made).[7]

---

[7] For the same reasons, any claim based on mail tampering must be dismissed. *See Mendez v. Quiros*, No. 16-CV-2097, 2017 WL 374462, at *2 (D. Conn. Jan. 25, 2017) (dismissing mail tampering claim where the plaintiff did "not allege . . . that he suffered any injury or prejudice as a result of the opening of the mail outside of his presence and the withholding of the documents"); *Leniart v. Murphy*, No. 11-CV-1635, 2016 WL 1273166, at *13 (D. Conn. Mar. 31, 2016) (dismissing mail tampering claim where the plaintiff did "not claim that [his] mail . . . was censored or confiscated, only that it was read").

### 3. Conspiracy Claim

Plaintiff alleges that DeCastro and Clark "conspired" to violate his constitutional rights when they opened his mail and issued him a false misbehavior report. (Am. Compl. 24, 26–27.) As the Court earlier held, (*see* Opinion 28), any conspiracy claim is properly brought under 42 U.S.C. § 1985. Under that provision, Plaintiff must make "a showing of class-based invidiously discriminatory animus" on the part of the conspiring parties, *Hickey v. City of N.Y.*, No. 01-CV-6506, 2004 WL 2724079, at *22 (S.D.N.Y. Nov. 29, 2004) (citing *Kush v. Rutledge*, 460 U.S. 719, 726 (1983)), *aff'd*, 173 F. App'x 893 (2d Cir. 2006), as well as provide "some factual basis supporting a meeting of the minds, such that [the] defendants entered into an agreement, express or tacit, to achieve the unlawful end," *Webb v. Goord*, 340 F.3d 105, 110 (2d Cir. 2003) (citation and quotation marks omitted). The Amended Complaint does not allege any "racial, or perhaps otherwise class-based, invidiously discriminatory animus behind [Defendants'] action[s]." *Turkmen v. Hasty*, 789 F.3d 218, 262 (2d Cir. 2015) (citing *Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971)), *rev'd in part, vacated in part on other grounds*, 137 S. Ct. 1843 (2017). Nor does it provide any specific facts to plausibly suggest that DeCastro and Clark "entered into an agreement, express or tacit, to achieve [an] unlawful end." *Webb*, 340 F.3d at 110. Instead, Plaintiff merely states that DeCastro and Clark "conspired," acted "intentional[ly] and with malice," and acted "in a plot, [with] agreement and meeting of the minds," to tamper with Plaintiff's mail. (Am. Compl. 24–25.) These wholly conclusory allegations are insufficient. *See Lastra v. Barnes & Noble Bookstore*, No. 11-CV-2173, 2012 WL 12876, at *7 (S.D.N.Y. Jan. 3, 2012) (noting that "[u]nsubstantiated, conclusory, vague[,] or general allegations of a conspiracy" are insufficient to state a claim under § 1985 (citation omitted)), *aff'd*, 523 F. App'x 32 (2d Cir. 2013); *Van Dunk v. St. Lawrence*, 604 F. Supp. 2d 654, 663 (S.D.N.Y. 2009)

("[C]laims of conspiracy that are vague and provide no basis in fact must be dismissed." (quotation marks omitted)). Accordingly, Plaintiff's § 1985 conspiracy claim is dismissed.

### 4. First Amendment Retaliation Claims

#### a. Applicable Law

To state a First Amendment claim of retaliation, an inmate must allege "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the [inmate], and (3) that there was a causal connection between the protected conduct and the adverse action." *Holland v. Goord*, 758 F.3d 215, 225 (2d Cir. 2014) (citation, alteration, and quotation marks omitted). An adverse action is any "retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights." *Davis*, 320 F.3d at 353 (citation omitted). In determining whether a prison official's conduct constitutes adverse action, "the court's inquiry must be tailored to the different circumstances in which retaliation claims arise, bearing in mind that prisoners may be required to tolerate more than average citizens." *Id.* (citation, alterations, and quotation marks omitted). "[B]ecause virtually any adverse action taken against a prisoner by a prison official — even those otherwise not rising to the level of a constitutional violation — can be characterized as a constitutionally proscribed retaliatory act," the Second Circuit has instructed that district courts must "approach prisoner retaliation claims with skepticism and particular care." *Dolan v. Connolly*, 794 F.3d 290, 295 (2d Cir. 2015) (citation and quotation marks omitted). Accordingly, a First Amendment retaliation claim must be supported by "specific and detailed factual allegations," and not stated in "wholly conclusory terms." *Id.* (citation and quotation marks omitted).

### b. DeCastro

Plaintiff alleges that DeCastro has a "personal vendetta" against him deriving from Plaintiff's position as an IGRC inmate representative and their IGRC-related interactions, and that because of this vendetta, DeCastro "changed the status" of the First Report authored by Velez, authored the Second Report himself, and encouraged Encarnacion to file the Third Report. (Am. Compl. 11–12, 35, 40, 44, 54.)

As an initial matter, as the Court previously held, (*see* Opinion 22), to the extent Plaintiff alleges that the roots of DeCastro's retaliation are found in Plaintiff's IGRC position, such conduct, liberally construed, constitutes protected activity. *See Dolan*, 794 F.3d at 295 (holding that "retaliation against a prisoner for filing or voicing grievances on behalf of a prison population as a member of an inmate grievance body . . . violates the right to petition government for the redress of grievances guaranteed by the First and Fourteenth Amendments" (quotation marks omitted)); *see also Dolan v. Connolly*, No. 13-CV-5726, 2017 WL 825311, at *5 n.10 (S.D.N.Y. Mar. 2, 2017) (collecting cases for the proposition that "advocacy on behalf of an [inmate grievance body] is constitutionally protected").

The next question is whether the Amended Complaint alleges adverse action. The only adverse action alleged with respect to DeCastro are the three misbehavior reports. As to the First and Third Reports, however, they were not issued by DeCastro; rather, the First Report was issued by Velez and the Third Report by Encarnacion. (Am. Compl. 11, 18–19, 21, 38, 78.) Plaintiff alleges that DeCastro "reviewed" and "changed the status" of the First Report, (*id.* at 11–13), yet, as indicated by the documents attached to the Amended Complaint, DeCastro appears to have been involved only to the extent that he provided Plaintiff with a copy of report on April 23, 2013, (*id.* at 21–22). Put differently, the Amended Complaint does not allege facts

plausibly indicating that DeCastro falsified the First Report; indeed, Plaintiff repeatedly limits his complaint with regard to the First Report to the allegations that it was "inadequate/not clear what the charges [were]," that it did not follow procedures on notice," and that he was "denied . . . a clear [and] [adequate] copy" of the report. (*Id.* at 11–12.) Similarly, Plaintiff alleges that DeCastro encouraged Encarnacion to file the Third Report, (*id.* at 38–39, 71), yet, this statement is wholly conclusory and thus insufficient. *See Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir. 1999) ("[C]onclusory allegations of a §1983 conspiracy are insufficient." (citation and quotation marks omitted)); *Aho v. Anthony*, 782 F. Supp. 2d 4, 7 (D. Conn. 2011) (dismissing claim where "[t]he only allegation with respect to the defendants' personal involvement is that" they were "acting in concert" with each other); *Malcolm v. Honeoye Falls–Lima Educ. Ass'n*, 678 F. Supp. 2d 100, 107 (W.D.N.Y. 2010) ("[A] complaint containing only conclusory, vague or general allegations of conspiracy to deprive a person of constitutional rights cannot withstand a motion to dismiss." (quoting *Sommer v. Dixon*, 709 F.2d 173, 175 (2d Cir. 1983))).

However, as to the Second Report, Plaintiff alleges that it was authored by DeCastro and, critically, that it was ultimately "reversed" on administrative appeal following the Second Hearing. (Am. Compl. 24–25, 30, 32, 34; Pl.'s Mem. 21.) In Plaintiff's view, the reversal constitutes proof that DeCastro was lying and that the report was therefore false and retaliatory. (Am. Compl. 26–28; Pl.'s Mem. 25 ("It is a fact when a misbehavior report get[s] vindicated it shows the Defendants deliberately and . . . maliciously interfered and lied.").) Defendants argue in response that "Plaintiff does not allege the basis for the reversal, which may have had nothing to do with the truth of the allegations in the [Second Report]." (Defs.' Mem. 16 n.4.) That is true, yet, liberally construed, that the Second Report was reversed on appeal does tend to support Plaintiff's allegation that the alleged adverse action was "unjustified" and "unwarranted."

*Bennett v. Goord*, 343 F.3d 133, 138–39 (2d Cir. 2003) (denying summary judgment on retaliation claim where the plaintiff adduced evidence that, inter alia, numerous misbehavior reports were reversed on administrative appeal); *see also Nunez v. Donahue*, No. 12-CV-1071, 2015 WL 13744630, at *11 (N.D.N.Y. Nov. 23, 2015) ("The fact that a misbehavior report was administratively reversed and expunged supports a plaintiff's allegations that the misbehavior report was false and retaliatory." (citation omitted)), *adopted by* 2016 WL 29616 (N.D.N.Y. Jan. 4, 2016). This is not a case where other allegations in the Amended Complaint cut against the conclusion that the Second Report was falsified or unsubstantiated. *Cf. Crenshaw v. Korbar*, No. 09-CV-6167, 2013 WL 1681833, at *2 (W.D.N.Y. Apr. 17, 2013) (dismissing retaliation claim because, "[a]lthough the disposition of guilty was ultimately reversed, the record shows that [the defendant] had a reasonable basis for the charges, and [the] plaintiff . . . presented no evidence to suggest that she had any particular motive to retaliate against him"). Therefore, Plaintiff has sufficiently stated adverse action with respect to the Second Report. *See Gill v. Pidlypchak*, 389 F.3d 379, 384 (2d Cir. 2004) (holding that "the filing of false misbehavior reports" that result in sentences such as "three weeks in keeplock . . . would deter a prisoner of ordinary firmness from vindicating his or her constitutional rights" and thus constitutes adverse action).

The final question is whether Plaintiff has sufficiently alleged a plausible causal connection between the adverse action (the Second Report) and the protected activity (Plaintiff's position as an inmate IGRC representative). In considering whether a causal connection exists, "a court may infer an improper or retaliatory motive in the adverse action from: (1) the temporal proximity of the filing to the grievance and the disciplinary action; (2) the inmate's prior good disciplinary record; (3) vindication at a hearing on the matter; and (4) statements by the defendant regarding his motive for disciplining the plaintiff." *Barnes v. Harling*, — F. Supp. 3d

—, 2019 WL 1319479, at *15 (W.D.N.Y. Mar. 19, 2019) (citation and quotation marks omitted); *see also Vogelfang*, 889 F. Supp. 2d at 517 (describing causation factors); *Harnage v. Brighthaupt*, 168 F. Supp. 3d 400, 414 (D. Conn. Mar. 1, 2016) ("With regard to false misbehavior reports, the types of evidence required to establish a causal connection between the plaintiff's protected conduct and the alleged retaliation include temporal proximity, prior good discipline, a finding of not guilty at the disciplinary hearing[,] and statements from the defendants regarding their motives." (citation and alterations omitted)), *aff'd*, 720 F. App'x (2d Cir. 2018).

Here, Plaintiff alleges that he served as an inmate representative on the IGRC for a "little over five years." (Am. Compl. 11, 35, 40.) He alleges that, over this period, he had numerous interactions and disagreements with DeCastro in connection with that position, including certain "grievance hearings" against DeCastro which led to "adverse findings" against him. (*Id.* at 35, 40.) This allegedly caused DeCastro to "threaten" Plaintiff by saying that Plaintiff was "on the 'burn,' meaning watch [your] back." (*Id.* at 12.) Further, DeCastro would "harass[]" and "threat[en]" Plaintiff and the other IGRC inmate representatives by authorizing "unwarrant[ed] cell searches." (*Id.* at 12, 35.) In sum, Plaintiff alleges, DeCastro had a longstanding "personal vendetta" against him, which led him to issue the false (and ultimately reversed) Second Report. (*Id.* at 11, 40.) These allegations, which were not in the initial Complaint, (*see* Opinion 22–24), are sufficient to plausibly allege that Plaintiff's position on the IGRC, and the attendant negative interactions he had with DeCastro, were "a substantial or motivating factor" in DeCastro's conduct. *Hanner v. Westchester County*, No. 16-CV-7610, 2019 WL 1299462, at *8 (S.D.N.Y. Mar. 21, 2019) (quoting *Dorsey v. Fisher*, 468 F. App'x 25, 27 (2d Cir. 2012)). As such, this case is different from those in which plaintiffs have offered only conclusory allegations to

establish a causal nexus. *See Vogelfang*, 889 F. Supp. 2d at 517 (holding that "repeatedly assert[ing] that [the plaintiff's] perceived mistreatment is a result of retaliatory animus on the part of the defendants," without "any specific and detailed factual allegations to support that assertion," is insufficient to establish a causal connection (quoting *Friedl v. City of New York*, 210 F.3d 79, 85–86 (2d Cir. 2000))); *Bouknight v. Shaw*, No. 08-CV-5187, 2009 WL 969932, at *6 (S.D.N.Y. Apr. 6, 2009) (finding plaintiff's allegation that the defendant "wrote me up for revenge" is "mere speculation" and therefore insufficient to plausibly establish "the requisite causal connection").

To be sure, Plaintiff does not have a "reasonable expectation of privacy in his or her prison cell," and, accordingly, the search of his cell, "even [if done] for retaliatory reasons, . . . does not implicate a constitutional right." *Battice v. Phillip*, No. 04-CV-669, 2006 WL 2190565, at *7 (E.D.N.Y. Aug. 2, 2006) (collecting cases); *see also Harnage v. Brighthaupt*, No. 12-CV-1521, 2016 WL 10100763, at *6 (D. Conn. June 3, 2016) (holding that "even if [the plaintiff] could demonstrate a retaliatory motive for the search, his claim would be legally insufficient" to "support a First Amendment retaliation claim"), *aff'd*, 720 F. App'x 79 (2d Cir. 2018). Yet, even if "a cell search alone is not actionable," courts have held that, when "combined . . . with other wrongful conduct," such allegations may be sufficient to state a claim. *Stewart v. Richardson*, No. 15-CV-9034, 2016 WL 7441708, at *5 (S.D.N.Y. Dec. 27, 2016) (collecting cases). Further, as Defendants point out, (Defs.' Mem. 15–16), Plaintiff does not provide specific details (beyond stating that he had been an IGRC representative for about five years) as to when, exactly, he had his "numerous" IGRC-related disagreements with DeCastro, when DeCastro allegedly threatened him that he was "on the burn," or when the "adverse findings" were made against DeCastro. Yet, construed liberally, the Amended Complaint suggests that Plaintiff had an ongoing

relationship with DeCastro through their IGRC-related interactions. Thus, although temporal proximity does not clearly weigh in favor of a finding of causal connection, it does not clearly weigh against it, either. *See Espinal v. Goord*, 558 F.3d 119, 129 (2d Cir. 2009) (noting that a court must "exercise its judgment about the permissible inferences that can be drawn from temporal proximity in the context of particular cases").

In sum, construing the Amended Complaint to raise the strongest arguments it plausibly suggests, *see Sykes*, 723 F.3d at 403, the Court concludes that the alleged combination of DeCastro's threatening comments to Plaintiff, his unauthorized cell searches, and the "adverse findings" against him, over the course of an ongoing contentious relationship with Plaintiff, are sufficient to suggest retaliatory animus and, therefore, to establish a causal connection between the Second Report and Plaintiff's protected conduct. (Am. Compl. 11–12, 35, 40.) Therefore, Plaintiff states a prima facie retaliation claim against DeCastro. Accordingly, the Court denies the Motion To Dismiss Plaintiff's retaliation claim against DeCastro.[8]

### c. Velez and Encarnacion

Separate from his allegations against DeCastro, Plaintiff alleges that Velez retaliated against him in authoring the First Report and that Encarnacion did the same in authoring the Third Report. (Am. Compl. 11, 35, 38.) Yet, even assuming these misbehavior reports constitute adverse action with respect to the authoring Defendant, Plaintiff fails to allege a plausible causal connection between the authoring Defendant and Plaintiff's protected conduct as an IGRC representative. Unlike with DeCastro, Plaintiff does not allege that he had any ongoing relationship or repeated interactions with Velez or Encarnacion. Indeed, the Amended

---

[8] Defendants argue that, in any event, they are entitled to qualified immunity on Plaintiff's retaliation claim. The Court considers, and rejects, this argument *infra* II.B.5.

Complaint does not appear even to allege that these Defendants knew that Plaintiff was on the IGRC. Thus, no allegations plausibly suggest that Velez or Encarnacion had any motivation to retaliate against Plaintiff or otherwise were causally connected to Plaintiff's protected conduct. *See Mateo v. Dawn*, No. 14-CV-2620, 2016 WL 5478431, at *8 (S.D.N.Y. Sept. 28, 2016) (holding a plaintiff's failure to allege any knowledge of the protected conduct results in a "fail[ure] to establish a plausible causal connection" for the purposes of a retaliation claim). Moreover, that the First and Third Reports were, unlike DeCastro's Second Report, affirmed on appeal, (Am. Compl. 14, 23, 72), tends to suggest that they were not, in fact, retaliatory. *See Brown v. Goord*, No. 04-CV-785, 2007 WL 607396, at *15 (N.D.N.Y. Feb. 20, 2007) ("[The plaintiff] has adduced no evidence that either of those two misbehavior reports were false. Indeed, the record evidence — which establishes that the misbehavior reports led to disciplinary convictions that were affirmed on appeal — is to the contrary." (footnotes omitted)). Therefore, in the absence of "specific and detailed factual allegations" of a causal connection between the First and Third Reports and Plaintiff's protected conduct, *Dolan*, 794 F.3d at 295, Plaintiff's retaliation claims against Velez and Encarnacion fail.

### 5. Qualified Immunity

"The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (citation and quotation marks omitted). In determining whether a right is clearly established, the "inquiry turns on the objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken." *Id.* at 244 (citation and quotation marks omitted). "In the Second Circuit, 'a right is clearly established if (1) the law

is defined with reasonable clarity, (2) the Supreme Court or the Second Circuit has recognized the right, and (3) a reasonable defendant would have understood from the existing law that his conduct was unlawful.'" *Schubert v. City of Rye*, 775 F. Supp. 2d 689, 702 (S.D.N.Y. 2011) (quoting *Luna*, 356 F.3d at 490).

Defendants argue that they are entitled to qualified immunity on Plaintiff's First Amendment retaliation claims because it was not clearly established, at the time Defendants' alleged retaliation occurred in 2012 and 2013, that Plaintiff's position as an inmate representative on the IGRC constituted protected conduct. (Defs.' Mem. 16–18.) In support, Defendants rely on the Second Circuit's 2015 decision in *Dolan v. Connolly* ("*Dolan I*") for the proposition that it had "not held *specifically* that a prisoner engages in constitutionally protected conduct by carrying out the duties of a member of an [inmate grievance body]." *Dolan I*, 794 F.3d at 295 (emphasis added). Therefore, in Defendants' view, it was only in 2015 — at least two years after the alleged conduct in this case — "that retaliation against a prisoner for filing or voicing grievances on behalf of a prison population as a member of an inmate grievance body" violated a clearly established right. *Id.*

This reliance is misplaced. As an initial matter, a right does not become clearly established only when there is "specific authority directly on point"; rather, a right becomes clearly established where "the circuit's decisions 'clearly foreshadow' a particular ruling on the issue." *Varrone v. Bilotti*, 123 F.3d 75, 79 (2d Cir. 1997) (citation omitted). Thus, the Second Circuit's statement in *Dolan I* that it had not "specifically" decided the issue is not dispositive. More fundamentally, it was "clearly foreshadowed" at the time of the alleged conduct here that Plaintiff's IGRC position was protected conduct. As the one district court to have applied *Dolan I* to the question of qualified immunity stated:

In *Dolan* [*I*] itself, the Second Circuit observed that it was "well established that retaliation against a prisoner for pursuing a grievance violates the right to petition government for the redress of grievances guaranteed by the First and Fourteenth Amendments and is actionable under § 1983." Further, the [Second Circuit] found "no sufficient basis to distinguish a prisoner's conduct in filing a grievance on his own behalf and the filing or voicing, as a member of a prisoner grievance body, of grievances on behalf of other prisoners." Thus, the [Second Circuit] concluded that "[the plaintiff's] alleged actions as an [inmate grievance] representative are similar, if not identical, to the grievance-related activity already established as constitutionally protected conduct."

*Dolan*, 2017 WL 825311, at *4 ("*Dolan II*") (citations and some quotation marks omitted). This analysis is persuasive. Relevant here, in 1996, the Second Circuit considered a case in which the plaintiff, an inmate, provided IGRC representatives investigating a particular grievance the names of five inmates who "would be willing to represent the other prisoners in the grievance process." *Graham v. Henderson*, 89 F.3d 75, 77 (2d Cir. 1996). The plaintiff was thereafter issued an allegedly false and retaliatory misbehavior report by a correction officer. *Id.* at 78. The Second Circuit held that the plaintiff's "filing of a grievance and attempt to find inmates to represent . . . grievants" was protected conduct that implicated the "right to petition government" — "in both judicial *and* administrative forums" — "for the redress of grievances guaranteed by the First and Fourteenth Amendments." *Id.* at 80. Further, in 2004, the Second Circuit considered a case in which the plaintiff, an inmate, filed grievances against prison officials and was thereafter issued allegedly retaliatory misbehavior reports. *See Gill*, 389 F.3d at 380. The Second Circuit broadly held that "use of the prison grievance system" constitutes protected activity. *Id.* at 384. Reading these cases together, as did the district court in *Dolan II*, 2017 WL 825311, at *5, it can fairly be said that, by 2004, it was clearly foreshadowed that an inmate's participation in a prison's grievance committee squarely implicates his right to petition the government. Put differently, at the time the alleged retaliation in this case occurred, in 2012 and 2013, it was clearly established that Plaintiff's IGRC position "[fell] within the type of First

Amendment advocacy to which prisoners had a clearly established right." *Dolan II*, 2017 WL 825311, at *5.

Qualified immunity is an affirmative defense on which Defendants bear the burden of proof. *See Lore v. City of Syracuse*, 670 F.3d 127, 149 (2d Cir. 2012) (citation omitted). For qualified immunity to bar suit at the motion to dismiss stage, "[n]ot only must the facts supporting the defense appear on the face of the complaint, but, as with all Rule 12(b)(6) motions, the motion may be granted only where it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *McKenna v. Wright*, 386 F.3d 432, 436 (2d Cir. 2004) (citations and quotation marks omitted). Defendants fail to satisfy their burden at this stage, particularly given that they do not, beyond describing *Dolan I* and citing to *Dolan II*, engage with the contrary analysis presented in *Dolan II*. (*See* Defs.' Mem. 17.) Accordingly, the Court declines to grant Defendants qualified immunity against money damages on Plaintiff's First Amendment free exercise claim.

### III. Conclusion

For the foregoing reasons, Defendants' Motion To Dismiss is granted in part and denied in part. All Defendants and claims except for Plaintiff's First Amendment retaliation claim against DeCastro are dismissed. Dismissal is with prejudice.[9]

---

[9] Even pro se plaintiffs are not entitled to amend a complaint if the complaint "contains substantive problems such that an amended pleading would be futile." *Lastra*, 2012 WL 12876, at *9. Here, Plaintiff "has already had two bites at the apple, and they have proven fruitless." *Melvin v. County of Westchester*, No. 14-CV-2995, 2016 WL 1254394, at *24 n.19 (S.D.N.Y. Mar. 29, 2016) (citation, alterations, and quotation marks omitted); *see also Al-Qadaffi v. Servs. for the Underserved (SUS)*, No. 13-CV-8193, 2015 WL 585801, at *8 (S.D.N.Y. Jan. 30, 2015) (denying leave to amend where the plaintiff "has already had one chance to amend his [c]omplaint, and there is still no indication that a valid claim might be stated if given a second chance"), *aff'd*, 632 F. App'x 31 (2d Cir. 2016). The Court finds that further amendment on these claims would be futile.

The Clerk of the Court is respectfully requested to terminate the pending motion, (Dkt. No. 74), and to mail a copy of this Opinion to Plaintiff.

The Court will hold a status conference on May 3, 2019, at 2:00 p.m.

SO ORDERED.

DATED:    March 29, 2019
          White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE