UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

BERNARD THOMAS,

                              Plaintiff,

       v.

LIEUTENANT DECASTRO,

                              Defendant.

No. 14-CV-6409 (KMK)

<u>OPINION & ORDER</u>

<u>Appearances</u>:

Bernard Thomas
Brooklyn, NY
*Pro Se Plaintiff*

Brendan Horan, Esq.
New York State Office of the Attorney General
New York, NY
*Counsel for Defendant*

KENNETH M. KARAS, United States District Judge:

      Bernard Thomas ("Plaintiff") brings this pro se Action, pursuant to 42 U.S.C. § 1983,

against Lieutenant John DeCastro ("DeCastro"), Deputy Superintendent of Security Timothy

Humphrey ("Humphrey"), Deputy Superintendent for Programs Jean King ("King"), Lieutenant

Steven Katz ("Katz"), Correction Officer Damian Velez ("Velez"), Brenda Clark ("Clark"),

Imam Samuel Encarnacion ("Encarnacion"), and Director of Special Housing Albert Prack

("Prack") (collectively, the "AC Defendants"), alleging that while Plaintiff was incarcerated at

Woodbourne Correctional Facility ("Woodbourne"), the AC Defendants violated his rights under

the First and Fourteenth Amendments by issuing him false misbehavior reports and subsequently

subjecting him to retaliatory disciplinary hearings.  (*See* Am. Compl. (Dkt. No. 70).)  By

Opinion & Order dated March 29, 2019, the Court dismissed all claims against Humphrey, King, Katz, Velez, Clark, Encarnacion, and Prack, and all but one claim against DeCastro (hereinafter, "Defendant"). (Op. & Order (Dkt. No. 89).) Currently before the Court is Defendant's Motion for Summary Judgment (the "Motion"). (*See* Not. of Mot. (Dkt. No. 156).) For the reasons that follow, Defendant's Motion is granted.

## I. Background

### A. Factual Background

The following facts are taken from the declarations submitted, (Dkt. Nos. 158–62), and Defendant's Statement pursuant to Local Civil Rule 56.1, (Def.'s Rule 56.1 Statement in Supp. of Motion ("Def.'s 56.1") (Dkt. No. 164)).[1] These facts are recounted "in the light most

---

[1] Local Civil Rule 56.1(a) requires the moving party to submit a "short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried." Local Civ. R. 56.1(a). The nonmoving party, in turn, must submit "a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party, and if necessary, additional paragraphs containing a separate, short[,] and concise statement of additional material facts as to which it is contended that there exists a genuine issue to be tried." Local Civ. R. 56.1(b). "Pro se litigants are not excused from meeting the requirements of Local Rule 56.1," *Freistat v. Gasperetti*, No. 17-CV-5870, 2021 WL 4463218, at *1 (E.D.N.Y. Sept. 29, 2021) (italics, alteration, and citation omitted), and "[a] nonmoving party's failure to respond to a Rule 56.1 statement permits the court to conclude that the facts asserted in the statement are uncontested and admissible," *T.Y. v. N.Y.C. Dep't of Educ.*, 584 F.3d 412, 418 (2d Cir. 2009); *see also Biberaj v. Pritchard Indus., Inc.*, 859 F. Supp. 2d 549, 553 n.3 (S.D.N.Y. 2012) (same). Here, Defendant filed and served his Statement pursuant to Rule 56.1, (*see* Dkt. Nos. 164, 165), and filed and served a Statement notifying Plaintiff of the potential consequences of not responding to the Motion, as required by Local Rule 56.2, (*see* Dkt. Nos. 163, 165). Despite this notice, Plaintiff failed to submit a response to Defendant's 56.1 Statement. Accordingly, the Court may conclude that the facts in Defendant's 56.1 Statement are uncontested and admissible. *See Brandever v. Port Imperial Ferry Corp.*, No. 13-CV-2813, 2014 WL 1053774, at *3 (S.D.N.Y. Mar. 13, 2014) (concluding that because the pro se plaintiff did not submit a Rule 56.1 statement in response to the defendant's statement of facts, "there [were] no material issues of fact"); *Anand v. N.Y. State Div. of Hous. & Cmty. Renewal*, No. 11-CV-9616, 2013 WL 4757837, at *7 (S.D.N.Y. Aug. 29, 2013) (same).

Nevertheless, in light of the "special solicitude" afforded to pro se litigants "when confronted with motions for summary judgment," *Graham v. Lewinski*, 848 F.2d 342, 344 (2d

favorable to" Plaintiff, the non-movant.  *Wandering Dago, Inc. v. Destito*, 879 F.3d 20, 30 (2d Cir. 2018) (quotation marks omitted).  The facts as described below are not in dispute, except to the extent indicated.

### 1.  Plaintiff's Work on the IGRC

Plaintiff first entered the custody of the New York State Department of Corrections and Community Supervision ("DOCCS") in 1983 and was in and out of DOCCS custody until 2014. (Decl. of Brendan Horan in Supp. of Mot. ("Horan Decl.") (Dkt. No. 161) Ex. B ("Pl. Dep.") 12:17–16:9 (Dkt. No. 161-2).)  Plaintiff entered Woodbourne in or around 2007 or 2008, where he remained until approximately 2013.  (*Id.* at 19:9–20:1.)  From approximately 2009 through 2012, Plaintiff served as a member of Woodbourne's Inmate Grievance Resolution Committee ("IGRC").  (*Id.* at 21:14–19.)[2]  The IGRC's role was to collect grievances from inmates around

---

Cir. 1988), the Court will "in its discretion opt to conduct an assiduous review of the record," including Plaintiff's deposition testimony, when deciding the instant Motion, *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001) (quotation marks omitted); *see also Day v. MTA N.Y.C. Transit Auth.*, No. 17-CV-7270, 2021 WL 4481155, at *9 (S.D.N.Y. Sept. 30, 2021) ("[W]here a pro se plaintiff fails to submit a proper Rule 56.1 statement in opposition to a summary judgment motion, the [c]ourt retains some discretion to consider the substance of the plaintiff's arguments, where actually supported by evidentiary submissions." (italics and citation omitted)); *Berry v. Marchinkowski*, 137 F. Supp. 3d 495, 502 n.1 (S.D.N.Y. 2015) (considering "the statements and documents in [the] [p]laintiff's opposition papers to determine if there are any material issues of fact based on the evidence in the record," but disregarding factual assertions that "do not contain citations to the record, or are not supported by the citations in the record"); *Houston v. Teamsters Local 210, Affiliated Health & Ins. Fund-Vacation Fringe Benefit Fund*, 27 F. Supp. 3d 346, 349 (E.D.N.Y. 2014) ("Although [the] plaintiffs did not file a Rule 56.1 statement, the [c]ourt has independently reviewed the record to ensure that there is uncontroverted evidence to support the paragraphs referenced in [the] defendants' Rule 56.1."); *Pagan v. Corr. Med. Servs.*, No. 11-CV-1357, 2013 WL 5425587, at *2 (S.D.N.Y. Sept. 27, 2013) (explaining that "[t]he [c]ourt ha[d] considered the [motions for summary judgment] in light of the entirety of the record to afford [the pro se] [p]laintiff the special solicitude to which he [was] entitled" where the plaintiff failed to submit a Rule 56.1 response).

[2] The Court notes that Plaintiff's testimony regarding his tenure on Woodbourne's IGRC is inconsistent.  When asked, "How long were you on the IGRC," Plaintiff responded, "Five years."  (Pl. Tr. 21:8–9.)  But when asked to estimate the beginning and end of his tenure,

the facility, call each grievant before the full IGRC to determine whether the grievant wished to go forward with the grievance, and, if the grievant did wish to go forward, hold a hearing to determine if the grievance was substantiated.  (*Id.* at 32:19–23, 42:11–43:2, 59:9–60:15.)  The IGRC would then formalize its determination in a written opinion, which either the grievant or the subject of the grievance could appeal to the superintendent of the facility.  (*Id.* at 59:5–61:12.)

Plaintiff first came to know Defendant as a result of Plaintiff's work on the IGRC, as Plaintiff helped to adjudicate a number of grievances that were made against Defendant by other inmates.  (*Id.* at 51:13–52:1, 53:11–55:8.)  Plaintiff testified that after the IGRC resolved five to six grievances against Defendant, Defendant began to impose unmerited minor punishments on Plaintiff, such as unnecessary cell searches or reprimands for failure to properly display his identification card.  (*Id.* at 67:16–71:24.)  Based on this behavior, Plaintiff came to believe that Defendant had a "personal vendetta" against him based on Plaintiff's role on the IGRC in finding grievances made against Defendant to be substantiated.  (*Id.*)  Defendant attested that he neither recalled any grievances filed against him while Plaintiff was on the IGRC nor that he ever felt any animosity toward Plaintiff or the IGRC.  (Decl. of John DeCastro in Supp. of Mot. ("DeCastro Decl.") ¶¶ 32–34 (Dkt. No. 158).)

### 2.  The April 2, 2013 Misbehavior Report

At some point prior to April 2, 2013, Plaintiff sent out a letter in an envelope addressed to: "Mr. Mike Distefano Esq., [Attorney At Law], P.O. Box 30201, New Yo . . . " (the "Letter"). (*See* DeCastro Decl. Ex. A (brackets in original); *see also* Pl. Dep. 113:17–115:25; Def.'s 56.1

---

Plaintiff testified that he started on the IGRC in 2009 and ended in 2012—a period of only three years.  (*Id.* at 21:14–19.)  However, the length of Plaintiff's tenure on the IGRC is neither dispositive nor material, so this inconsistency does not impact the disposition of the Motion.

¶ 1.)[3]  The envelope was stamped "LEGAL MAIL," and bore Plaintiff's name, Plaintiff's DIN, and Woodbourne's address on the upper left-hand corner as a return address.  (*See* DeCastro Decl. Ex. A; Pl. Dep. 116:1–3, 117:8–14; Def.'s 56.1 ¶¶ 3, 5.)

Envelopes pre-stamped with the "LEGAL MAIL" stamp are available at Woodbourne's law library for inmates to use to send privileged correspondence to their attorneys.  (Pl. Dep. 116:8–117:3; Def.'s 56.1 ¶ 4.)  Woodbourne handles legal mail differently from non-legal mail.  (*See, e.g.*, Decl. of Donald Venettozzi in Supp. of Mot. ("Venettozzi Decl.") ¶¶ 19, 21 (Dkt. No. 160); DeCastro Decl. ¶¶ 25–26; Def.'s 56.1 ¶¶ 43–47.)  According to DOCCS Directive No. 4421, entitled "Privileged Correspondence," outgoing legal mail "is entitled to a greater degree of confidentiality during processing within the facility than that which is accorded general correspondence," and may not be "opened, inspected, or read without express written authorization from the facility superintendent" (who may only authorize the reading of such correspondence under limited circumstances).  (Horan Decl. Ex. H.)  Moreover, inmates have a free weekly allowance for first class postage on outgoing legal mail, which accumulates if unused.  (*See id.*)  Inmates are not permitted to use envelopes stamped "LEGAL MAIL" for any correspondence that is not, in fact, legal mail.  (Pl. Dep. 117:4–7; Def.'s 56.1 ¶ 14.)

On April 2, 2013, Woodbourne received the Letter as incoming mail; the envelope bore a sticker stating, "Return to Sender, Attempted – Not Known, Unable to Forward."  (DeCastro Decl. Ex. A; Decl. of Brenda Clark in Supp. of Mot. ("Clark Decl.") ¶¶ 5, 7 (Dkt. No. 159); Def.'s 56.1 ¶ 15.)  Clark, a Senior Mail Clerk at Woodbourne, reviewed the envelope as part of her typical responsibilities, and believed that she recognized the name "Mike Distefano" as the name of a former Woodbourne inmate who had recently been released.  (Clark Decl. ¶¶ 1, 5, 10;

---

[3] The address on the envelope is partially obscured by a post office sticker.

Def.'s 56.1 ¶¶ 17–18.)  She checked DOCCS's computer records to confirm that a Michael

Distefano had recently been released from Woodbourne and checked the facility's list of

registered attorneys and attorneys' addresses to confirm that there was no attorney with the same

name and address.  (Clark Decl. ¶¶ 12–13; Def.'s 56.1 ¶¶ 20–21.)  Based on these checks, Clark

believed that the Letter was improperly classified as legal mail and opened the envelope to scan

the contents.  (Clark Decl. ¶¶ 14–15; Def.'s 56.1 ¶¶ 22–23.)  The envelope contained five pages,

the first four of which contained a typed narrative of a real or fictional military mission that

appeared to be entitled "Kill Squad," and the last of which contained a handwritten note that

read: "I need you to check this out got it off the computer William Doane # 88A9542 Ex-

Army/Head . . . ."  (DeCastro Decl. Ex. B (ellipsis in original); *see also* Clark Decl. ¶¶ 18–19;

Def.'s 56.1 ¶¶ 9–10.)  After scanning the pages, Clark determined that the Letter did not appear

to be "legal in nature," and "suspected that Plaintiff had attempted to circumvent the prison's

correspondence procedures by falsely designating non-legal mail as legal mail."  (Clark Decl.

¶¶ 20–21; Def.'s 56.1 ¶¶ 24–25.)  Clark then showed the Letter to Defendant—who was the

lieutenant in the office at the time—and explained her suspicions and their bases.  (Clark Decl.

¶¶ 22–24; *see also* DeCastro Decl. ¶¶ 8, 11–16; Def.'s 56.1 ¶¶ 26–28.)

Based on the information he received from Clark and after personally reviewing the

Letter, Defendant agreed that the Letter did not appear to be legal mail.  (DeCastro Decl. ¶¶ 17,

21; Def.'s 56.1 ¶¶ 29, 32.)  Defendant then wrote an inmate misbehavior report summarizing the

incident and noting that Plaintiff appeared to have violated several DOCCS policies: (1) Rule

180.11 Correspondence Procedures Per Directive 4422 & 4421; (2) Rule 114.10 Smuggling; and

(3) Rule 116.10 Misuse of State Property.  (DeCastro Decl. ¶ 27; *see also* DeCastro Decl. Ex. C;

Def.'s 56.1 ¶¶ 30, 33.)  Plaintiff disputes the accuracy of certain portions of the misbehavior

report.  (Pl. Dep. 110:1–7; Def.'s 56.1 ¶ 34.)  Specifically, Plaintiff disputes the statement in the misbehavior report that the Letter "was mailed to an ex-inmate" and the listed charges.  (Pl. Dep. 110:18–113:9.)

### 3.  The April 2013 Disciplinary Hearing

On April 4 and 8, 2013, King—a Hearing Officer at Woodbourne—held a disciplinary hearing on the April 2, 2013 misbehavior report that Defendant had written against Plaintiff.[4] Plaintiff received a copy of the misbehavior report in advance of the hearing, and at the hearing, received a copy of the Letter and was informed of his procedural rights, including to call witnesses to testify on his behalf.  (*See* Hr'g Tr. 3:7–16; Def.'s 56.1 ¶¶ 35, 37.)  Plaintiff declined to call any witnesses, and Defendant did not participate in the hearing.  (*See* Hr'g Tr. 9:7–9, 11:10–13; DeCastro Decl. ¶ 35; *see also* Pl. Dep. 167:11–19; Def.'s 56.1 ¶¶ 38, 40.) Plaintiff pled not guilty to each of the three rule violations listed on the misbehavior report, (Hr'g Tr. 6:8–7:12), and claimed that (1) "Mike Distefano" was not an ex-inmate, (*id.* at 7:12–13), (2) he did not know how he obtained the pages containing the typewritten narrative in the Letter, (*id.* at 10:10–16), and (3) the handwritten note in the Letter was not written in his handwriting, (*id.* at 10:25–11:1).  However, at his deposition, Plaintiff confirmed that, in fact, he had printed the pages containing the typewritten narrative off a computer in the law library, (Pl. Dep. 119:2–7, 121:25–122:4), and that the handwritten note was in his handwriting, because he wrote it, (*id.* at 119:11–16).

King found Plaintiff guilty of all three rule violations at the conclusion of the hearing. (*See* Hr'g Tr. 13:2–14:13; Def.'s 56.1 ¶ 41.)  At the time, this constituted Plaintiff's 47th guilty

---

[4] The hearing was held across two days because Plaintiff requested and received an adjournment to speak with a potential witness.  (*See* Horan Decl. Ex. D ("Hr'g Tr.") 8:3–9 (Dkt. No. 161-4).)

disposition on an inmate misbehavior report since June 1999, and Plaintiff's 7th guilty disposition involving the same or similar charges, four of which specifically involved violations of facility correspondence policies.  (*See* Horan Decl. Exs. F, G; Def.'s 56.1 ¶¶ 49–50.)

Plaintiff appealed this disposition, and on July 2, 2013, Prack—then the Director of Special Housing and Inmate Disciplinary programs for DOCCS, (*see* Venettozzi Decl. ¶¶ 1, 27)—reversed the disposition via a written memorandum which stated that the reason for the reversal was: "misbehavior report based on investigation requires report writer testimony," (Horan Decl. Ex. E (capitalization omitted); Def.'s 56.1 ¶ 42).  Prack has since retired, but his successor, Donald Venettozzi ("Venettozzi") provided a declaration in this Action.  (*See* Venettozzi Decl.)  Venettozzi attested to his opinion that while he was not the Director of Special Housing and Inmate Disciplinary Programs for DOCCS at the time, based on his review of the Letter, Defendant's declaration, the misbehavior report, the hearing transcript, and the reversal order and his own training and experience, "the disciplinary hearing disposition was reversed only because of a procedural error."  (*Id.* ¶¶ 7–11, 16, 22–23, 25.)  It is Venettozzi's belief that "the evidence appears to support the rule violations."  (*Id.* ¶ 26.)

### 4.  Consequences of the Disciplinary Hearing

Even though the disposition was ultimately reversed, Plaintiff testified that he still suffered consequences, including the loss of his position on the IGRC and mental anguish and depression.  (Pl. Dep. 184:13–24, 185:7–13, 201:15–202:21.)  Plaintiff also testified that he was transferred from Woodbourne to Great Meadow Correctional Facility as a result of this disposition, which resulted in the loss of certain of Plaintiff's personal property, though no one has ever explicitly told him that he was transferred as a result of the disposition.  (*Id.* at 202:22–204:25.)

B.  Procedural History

Plaintiff's initial Complaint was docketed on August 5, 2014, bringing claims against the AC Defendants in addition to Correction Officer J. LeChance, Deputy Superintendent of Administration Jeffrey Lindstrand, and Venettozzi (together, "OC Defendants").  (*See* Dkt. No. 2.)  Plaintiff's request to proceed in forma pauperis was granted on November 18, 2014. (*See* Dkt. No. 4.)  On April 18, 2017, the OC Defendants filed their Motion To Dismiss and accompanying papers.  (*See* Dkt. Nos. 46–48.)  On June 12, 2017, Plaintiff's Opposition was docketed.  (*See* Dkt. Nos. 54–55.)  The OC Defendants filed their Reply on July 5, 2017.  (*See* Dkt. No. 56.)  On March 13, 2018, the Court issued an Opinion & Order dismissing all of Plaintiff's claims without prejudice and directed Plaintiff to file an amended complaint to correct the deficiencies identified.  (*See* Op. & Order on Mot. To Dismiss (Dkt. No. 59).)

On May 15, 2018, Plaintiff's Amended Complaint was docketed, bringing claims against only the AC Defendants.  (*See* Am. Compl.)  On July 11, 2018, the AC Defendants filed a Motion To Dismiss and accompanying papers.  (*See* Dkt. Nos. 74–76.)  On August 15, 2018, Plaintiff's Opposition was docketed.  (*See* Dkt. No. 77.)  The AC Defendants filed their Reply on August 23, 2018.  (*See* Dkt. No. 78.)  On March 29, 2019, the Court issued an Opinion & Order dismissing with prejudice all of Plaintiff's claims except Plaintiff's First Amendment retaliation claim against Defendant.  (*See* Op. & Order on Mot. To Dismiss the Am. Compl. ("2019 Opinion") (Dkt. No. 89).)  Accordingly, Plaintiff's only remaining claim is that Defendant violated Plaintiff's rights under the First Amendment by issuing a false misbehavior report against Plaintiff in retaliation for Plaintiff's constitutionally protected conduct as a member of Woodbourne's IGRC.  (*Id.*)

Defendant filed his Answer on April 26, 2019, (*see* Dkt. No. 92), and the Parties commenced discovery, overseen by Magistrate Judge Lisa Smith, (*see, e.g.*, Dkt. Nos. 100–20). During this time period, Plaintiff came to be represented by pro bono counsel for the limited purpose of discovery.  (*See* Dkt. Nos. 112, 113.)  On February 25, 2020, the Parties filed competing pre-motion letters; Defendant sought to file a motion for summary judgment, (*see* Dkt. No. 121), and Plaintiff sought to file a motion for spoliation sanctions, based on Defendant's failure to retain grievances filed against Defendant from January 1, 2008 to December 31, 2013, (*see* Dkt. No. 122).  On March 6, 2020, the Court ruled that any summary judgment motion must await resolution of the spoliation motion, (*see* Dkt. No. 128), and on March 31, 2020, Plaintiff filed his Motion for Spoliation Sanctions ("Spoliation Motion") and accompanying papers, (*see* Dkt. Nos. 130–34).  On May 12, 2020, Defendant filed his Opposition to the Spoliation Motion, (*see* Dkt. Nos. 137–38), and on June 2, 2020, Plaintiff filed his Reply, (*see* Dkt. No. 139).  The Court held oral argument on Plaintiff's Spoliation Motion on October 26, 2020, (*see* Dkt. (minute entry for Oct. 26, 2020)), and denied it after argument, (*see* Order (Dkt. No. 147); *see also* Dkt. No. 152 (Tr. of Proceedings)).

On May 17, 2021, Defendant filed the instant Motion and accompanying papers.  (*See* Not. of Mot.; Def.'s Mem. of Law in Supp. of Mot. ("Def.'s Mem.") (Dkt. No. 157); DeCastro Decl.; Clark Decl.; Venettozzi Decl.; Horan Decl.; Not. Pursuant to Local Rule 56.2 (Dkt. No. 163); Def.'s 56.1; Cert. of Service (Dkt. No. 165).)  On July 6, 2021, Defendant wrote to the Court, noting that Plaintiff had never filed an opposition to the instant Motion, which was due to the Court on June 14, 2021.  (*See* Dkt. No. 166.)  The Court issued an Order on the same day deeming the Motion fully submitted.  (*See* Dkt. No. 167.)

## II.  Discussion

### A.  Standard of Review

Summary judgment is appropriate where the movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a); *see also Psihoyos v. John Wiley & Sons, Inc.*, 748 F.3d 120, 123–24 (2d Cir. 2014) (same).  "In determining whether summary judgment is appropriate," a court must "construe the facts in the light most favorable to the non-moving party and . . . resolve all ambiguities and draw all reasonable inferences against the movant."  *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (quotation marks omitted); *see also Borough of Upper Saddle River v. Rockland Cty. Sewer Dist. No. 1*, 16 F. Supp. 3d 294, 314 (S.D.N.Y. 2014) (same).  "It is the movant's burden to show that no genuine factual dispute exists."  *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004); *see also Berry*, 137 F. Supp. 3d at 521 (same).

 "However, when the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim," in which case "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment."  *CILP Assocs., L.P. v. Pricewaterhouse Coopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013) (alteration and quotation marks omitted).  Further, "[t]o survive a [summary judgment] motion . . . , [a nonmovant] need[s] to create more than a 'metaphysical' possibility that his allegations were correct; he need[s] to 'come forward with specific facts showing that there is a genuine issue for trial,'" *Wrobel v. County of Erie*, 692 F.3d 22, 30 (2d Cir. 2012) (emphasis omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)), "and cannot rely on the mere allegations or denials contained in the pleadings,"

*Guardian Life Ins. Co. v. Gilmore*, 45 F. Supp. 3d 310, 322 (S.D.N.Y. 2014) (quotation marks omitted); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009) ("When a motion for summary judgment is properly supported by documents or other evidentiary materials, the party opposing summary judgment may not merely rest on the allegations or denials of his pleading."). And, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

"On a motion for summary judgment, a fact is material if it might affect the outcome of the suit under the governing law." *Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene*, 746 F.3d 538, 544 (2d Cir. 2014) (quotation marks omitted). At this stage, "[t]he role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." *Brod*, 653 F.3d at 164 (quotation marks omitted). Thus, a court's goal should be "to isolate and dispose of factually unsupported claims." *Geneva Pharm. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 495 (2d Cir. 2004) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986)). However, a district court should "consider[] only evidence that would be admissible at trial." *Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*, 164 F.3d 736, 746 (2d Cir. 1998). "[W]here a party relies on affidavits . . . to establish facts, the statements 'must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant . . . is competent to testify on the matters stated.'" *DiStiso v. Cook*, 691 F.3d 226, 230 (2d Cir. 2012) (quoting Fed. R. Civ. P. 56(c)(4)).

Finally, the Second Circuit has instructed that when a court considers a motion for summary judgment, "special solicitude" should be afforded a pro se litigant, *see Graham,* 848

12

F.2d at 344; *Mercado v. Div. of N.Y. State Police,* No. 96-CV-235, 2001 WL 563741, at *7

(S.D.N.Y. May 24, 2001) (same), and a court should construe "the submissions of a pro se

litigant . . . liberally" and interpret them "to raise the strongest arguments that they suggest,"

*Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (italics and quotation

marks omitted).  Further, "the failure to oppose a motion for summary judgment alone does not

justify the granting of summary judgment."  *Vt. Teddy Bear Co.*, 373 F.3d at 244; *see also*

*Jackson v. Fed. Express*, 766 F.3d 189, 196 (2d Cir. 2014) (explaining that "an examination of

the legal validity of an entry of summary judgment should . . . be[] made in light of the opposing

party's pro se status" (italics omitted)).  Nonetheless, "proceeding pro se does not otherwise

relieve a litigant of the usual requirements of summary judgment, and a pro se party's bald

assertions unsupported by evidence . . . are insufficient to overcome a motion for summary

judgment."  *Houston*, 27 F. Supp. 3d at 351 (italics and quotation marks omitted); *see also*

*Flores v. City of New York*, No. 15-CV-2903, 2017 WL 3263147, at *2 (S.D.N.Y. July 31, 2017)

(same).

> B.  Analysis

"To prevail on a First Amendment retaliation claim, an inmate must establish (1) that the

speech or conduct at issue was protected, (2) that the defendant took adverse action against the

plaintiff, and (3) that there was a causal connection between the protected conduct and the

adverse action."  *Hayes v. Dahlke*, 976 F.3d 259, 272 (2d Cir. 2020) (quoting *Holland v. Goord*,

758 F.3d 215, 225 (2d Cir. 2014)).  "An inmate bears the burden of showing that 'the protected

conduct was a substantial motivating factor in the prison official['s] disciplinary decision.'"

*Holland*, 758 F.3d at 225–26 (quoting *Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996)); *see*

*also Brandon v. Kinter*, 938 F.3d 21, 40 (2d Cir. 2019) ("[M]ere negligence is not enough to

support a claim of retaliation.  A plaintiff must show some evidence of retaliatory intent to cause the adverse effect.").  "The defendant official then bears the burden of establishing that the disciplinary action would have occurred 'even absent the retaliatory motivation,' which he may satisfy by showing that the inmate 'committed the prohibited conduct charged in the misbehavior report.'"  *Holland*, 758 F.3d at 225 (alteration omitted) (quoting *Gayle v. Gonyea*, 313 F.3d 677, 682 (2d Cir. 2002)); *accord Vasquez v. County of Rockland*, No. 13-CV-5632, 2020 WL 883514, at *7 (S.D.N.Y. Feb. 24, 2020) (same).  Finally, the Second Circuit has instructed: "because we recognize both the near inevitability of actions by prison officials to which prisoners will take exception and the ease with which claims of retaliation may be fabricated, we examine prisoners' claims of retaliation with skepticism and particular care."  *Hayes*, 976 F.3d at 272 (alteration and citation omitted).

Defendant argues that Plaintiff's retaliation claim (Plaintiff's only remaining claim) fails because the undisputed evidence establishes: (1) that there was no causal connection between Plaintiff's constitutionally protected conduct as a member of the IGRC and any alleged adverse action by Defendant; (2) that Defendant would have issued the misbehavior report even absent his allegedly retaliatory motivation, because Plaintiff was guilty of the rule violations charged by Defendant; (3) that, in the alternative, Defendant is entitled to qualified immunity because his issuance of the misbehavior report was objectively reasonable in light of clearly established law; and (4) that, in any event, Plaintiff's claim for mental or emotional injuries must be dismissed because he has not shown any physical injury, as required under 42 U.S.C. § 1997e(e).  (*See generally* Def.'s Mem.)  The Court addresses these arguments only to the extent necessary to decide the instant Motion.

### 1.  Prima Facie Showing of Retaliation

Defendant appears to concede—or at least does not contest for purposes of the instant Motion—that Plaintiff's role on the IGRC constitutes protected conduct under the First Amendment and that Defendant's issuance of the April 2, 2013 misbehavior report constitutes adverse action.  (*See* Def.'s Mem. 9.)  However, Defendant argues that "Plaintiff has failed to adduce evidence that would plausibly support any causal connection between his role on the IGRC and Defendant's action in issuing an inmate misbehavior report on April 2, 2013," and thus, that Plaintiff cannot meet his burden of demonstrating a prima facie case of retaliation. (*Id.*)

As this Court explained in the 2019 Opinion, (*see* 2019 Op. 20–21), "[i]n evaluating whether a plaintiff has established the necessary causal connection of a retaliation claim, a court may infer an improper or retaliatory motive in the adverse action from: (1) the temporal proximity of the [protected activity] and the disciplinary action; (2) the inmate's prior good disciplinary record; (3) vindication at the hearing on the matter; and (4) statements by the defendant regarding his motive for disciplining the plaintiff."  *Barnes v. Harling*, 368 F. Supp. 3d 573, 600 (W.D.N.Y. 2019) (quotation marks omitted); *accord Shannon v. Venettozzi*, No. 13-CV-4530, 2015 WL 114179, at *5 (S.D.N.Y. Jan. 8, 2015) (same), *vacated on other grounds*, 670 F. App'x 29 (2d Cir. 2016); *see also Vogelfang v. Capra*, 889 F. Supp. 2d 489, 517 (S.D.N.Y. 2012) (explaining that "[t]he customary indicators which could give rise to an inference of retaliation" include "temporal proximity between [the plaintiff's protected activity] and the allegedly-retaliatory actions" and "telling comments by the defendant[]").  And Defendant correctly notes that a plaintiff cannot establish a causal connection simply by "reiterating the same, unadorned assertion" that his "perceived mistreatment is the result of

retaliatory animus on the part of the defendant[]." *Vogelfang*, 889 F. Supp. 2d at 518.  Rather, a plaintiff must offer "specific and detailed factual allegations to support that assertion."  *Id.* (quotation marks omitted).  (*See also* Def.'s Mem. 9–10.)

The Court agrees with Defendant that Plaintiff has not demonstrated that a genuine issue of material fact exists regarding whether Defendant's issuance of the April 2, 2013 misbehavior report bore a causal connection to Plaintiff's activity on the IGRC.

First, Plaintiff has produced no evidence demonstrating a temporal proximity between any of Plaintiff's conduct on the IGRC and Defendant's issuance of the misbehavior report.  The essence of Plaintiff's argument is that after the IGRC resolved five to six grievances against Defendant, Defendant developed a "personal vendetta" against Plaintiff, which manifested in a number of minor punishments (such as unnecessary cell searches), and eventually, the April 2, 2013 misbehavior report.  (Pl. Dep. 51:13–52:1, 53:11–55:8, 67:16–71:24.)  However, Plaintiff has not provided any specific details about these alleged grievances, which presumably could have been made at any point during Plaintiff's five-year tenure on the IGRC.  (*Id.* at 21:8–9.) For example, Plaintiff was not able to testify as to how many grievances were filed against Defendant in total during Plaintiff's tenure on the IGRC, (*id.* at 54:19–23); whether the grievances were based on inmate misbehavior reports filed by Defendant against the grievants or simply informal interactions between Defendant and the grievants, (*id.* at 56:15–25); or what percentage of the grievances the IGRC found to be substantiated, (*id.* at 72:13–73:20).  Plaintiff also was not able to "estimate approximately when it was that [Plaintiff] first noticed" Defendant's alleged "personal vendetta" against Plaintiff.  (*Id.* at 74:4–75:12.)  And while Plaintiff testified that Defendant "said a lot of little snickering little things to [Plaintiff]," including comments vaguely related to the IGRC, Plaintiff again could not testify as to when

16

Defendant made those remarks.  (*Id.* at 90:4–20.)  Thus, the Court finds that Plaintiff has failed

to demonstrate that any of his activity on the IGRC and Defendant's issuance of the April 2,

2013 misbehavior report were temporally proximate.[5]

Second, it is undisputed that at the time Defendant issued the April 2, 2013 misbehavior

report, Plaintiff had an exceptionally poor disciplinary record.  In the 14-year period between

June 1999 and April 2, 2013, Plaintiff had been found guilty on charges arising from 46 separate

inmate misbehavior reports, most of which involved multiple charges.  (*See* Horan Decl. Ex. F;

Def.'s 56.1 ¶ 49.)  Six of those guilty dispositions involved the same or similar charges to those

charged on the April 2, 2013 disciplinary report, and four of those specifically involved

violations of facility correspondence policies.  (Horan Decl. Ex. G; Def.'s 56.1 ¶ 50.)  As such,

Plaintiff cannot demonstrate that prior to April 2, 2013, he had a clean prison record, thus fatally

undercutting any suggestion that the misbehavior report was aberrant and, therefore, retaliatory.

*Cf. Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995) ("[W]e have determined that evidence of

prior good behavior . . . may be circumstantial evidence of retaliation."), *abrogated on other*

*grounds by Tangreti v. Bachmann*, 983 F.3d 609 (2d Cir. 2020).

_____

[5] Moreover, even if Plaintiff had demonstrated a temporal proximity between Plaintiff's conduct on the IGRC and Defendant's issuance of the misbehavior report, this evidence would only be "circumstantial evidence of retaliation," which, "without more, [would be] insufficient to survive summary judgment."  *Gill v. DeFrank*, No. 98-CV-7851, 2000 WL 270854, at *16 (S.D.N.Y. 2000) (collecting cases).  And as explained infra, Plaintiff has not even "attempt[ed] to allege any additional evidence of retaliation, such as a 'clean' prison record or incriminating statements made by [D]efendant."  *Id.* (quotation marks omitted); *see also Ross v. Koenigsmann*, No. 14-CV-1321, 2016 WL 11480164, at *17 (N.D.N.Y. Sept. 8, 2016) ("[The] [p]laintiff's sole evidence that the misbehavior report was issued in retaliation for his [protected activity] is temporal proximity.  [The] [p]laintiff does not allege that [the defendant] made any statements regarding her motive for issuing the misbehavior reports, nor is there any evidence that the misbehavior reports were dismissed.  A retaliation claim based on such thin evidence may fail at summary judgment.").

Third, it is undisputed that Plaintiff was found guilty of all three counts charged in the April 2, 2013 disciplinary report, and thus, he was not vindicated.  (*See* Hr'g Tr. 13:9–12.)  While the disposition was ultimately reversed on appeal, this reversal does not constitute "vindication" given that the stated reason for the reversal was purely procedural: "misbehavior report based on investigation requires report writer testimony."  (Horan Decl. Ex. E.)  Thus, this reversal does not support Plaintiff's claim that the misbehavior report was false and retaliatory.  (*See* Am. Compl. at unnumbered 25–26 (claiming that the reversal "shows the plaintiff was telling the truth!").)  While not dispositive, the Court also notes that Venettozzi—who is currently the Director of Special Housing and Inmate Disciplinary Programs for DOCCS and decides such appeals, (Venettozzi Decl. ¶¶ 1, 3–4)—attested to his opinion that "the evidence known to [Defendant] at the time that he wrote the inmate misbehavior report supports each of the three rule violations with which Plaintiff was charged" and "the disciplinary hearing disposition was reversed only because of a procedural error," (*id.* ¶¶ 25–27).  Thus, this factor, too, counsels against inferring a retaliatory motive.  *See Crenshaw v. Korbar*, No. 09-CV-6167, 2013 WL 1681833, at *2 (W.D.N.Y. Apr. 17, 2013) (granting summary judgment on retaliation claim because, "[a]lthough the disposition of guilty was ultimately reversed, the record shows that [the defendant] had a reasonable basis for the charges, and [the] plaintiff . . . presented no evidence to suggest that [the defendant] had any particular motive to retaliate against him").

Finally, there is no evidence that Defendant made any statements suggesting that he had a retaliatory motive in issuing the April 2, 2013 misbehavior report.  While, as referenced above, Plaintiff testified at his deposition that Defendant "said a lot of little snickering little things" to him, (Pl. Dep. 90:13–15), Plaintiff specifically testified that he never discussed Defendant's alleged vendetta against Plaintiff with Defendant, (*see id.* at 89:1–23).  Plaintiff did vaguely

testify that Defendant once commented to Plaintiff that "y'all inmate grievance reps you watch y'all back," (*id.* at 90:15–16), but when elaborating, Plaintiff appeared to explain that this comment was with respect to Defendant's strict enforcement of Woodbourne's policy requiring inmates to wear their identification cards when moving around the facility, (*see id.* at 90:15–20 ("All y'all inmate grievance reps you watch y'all back . . . .  Make sure I'm a get y'all.  Make sure you always got your pass on.  You ain't going to be able to go to certain blocks and stuff like that.")).  Plaintiff explained that Defendant would often reprimand Plaintiff for failure to follow this policy to the letter; a practice that other correction officers did not follow, since all correction officers knew which inmates were members of the IGRC and that these inmates were permitted to access all inmate areas of the facility to collect grievances.  (*Id.* at 90:21–98:21.)  As such, Plaintiff seems to concede that this comment made by Defendant did not in any way concern the conduct that led to Defendant's issuance of the April 2, 2013 misbehavior report.  Rather, it appears that the only statement Defendant has made concerning his motive in issuing the misbehavior report was in the declaration that he submitted in support of the Motion, in which he specifically stated: "My decision to draft the inmate misbehavior report was not motivated in any way by any intent to retaliate against Plaintiff for his role on the [IGRC], or by any motivation other than a belief that the circumstances indicated that he had violated the rules listed."  (DeCastro Decl. ¶ 31.)  As such, Plaintiff has provided no evidence of "telling comments" made by Defendant which would support the inference of a retaliatory motive in issuing the April 2, 2013 misbehavior report.  *See Vogelfang*, 889 F. Supp. 2d at 517.

### 2.  Likelihood of Disciplinary Action Absent Retaliatory Motivation

Even assuming arguendo that Plaintiff could establish a prima facie case of retaliation, Defendant has met his burden of establishing "that the disciplinary action would have occurred

even absent the retaliatory motivation" by "showing that [Plaintiff] committed the prohibited

conduct charged in the misbehavior report," providing an independent basis for granting

summary judgment. *Holland*, 758 F.3d at 225 (alteration and quotation marks omitted).  The

conduct which led to the issuance of the April 2, 2013 misbehavior report is not complicated.

DOCCS Directive No. 4421 defines "privileged correspondence" as "correspondence addressed

by an inmate to . . . [a]ny attorney, approved legal representative, representative employed or

supervised by an attorney, or any legal services organization."  (Horan Decl. Ex. H.)  It is

undisputed that "Mr. Mike Distefano, Esq." is not an attorney, (Def.'s 56.1 ¶ 12), and moreover,

that when Plaintiff sent the Letter, he was not seeking legal advice, (Def.'s 56.1 ¶ 13); thus, it is

undisputed that Plaintiff violated DOCCS policy in using an envelope stamped "LEGAL MAIL"

to attempt to send the Letter.

There is equally no genuine dispute that Defendant had a reasonable basis to believe that

Plaintiff had violated Woodbourne's correspondence policies at the time that he issued the April

2, 2013 misbehavior report.  As explained above, when Clark received and reviewed the

envelope, she believed she recognized the name "Mike Distefano" as the name of a former

Woodbourne inmate—a belief she verified against both DOCCS records and Woodbourne's list

of registered attorneys. *See supra* I.A.2.  She then reviewed the Letter, confirmed that it did not

contain a request for legal advice, and brought the Letter to Defendant. *Id.*  After hearing Clark's

explanation, Defendant reviewed the Letter himself, agreed that the Letter did not appear to be

legal mail, and wrote the inmate misbehavior report. *Id.*  While Plaintiff disputes the statement

in the misbehavior report that the Letter "was mailed to an ex-inmate" and the listed charges, (Pl.

Dep. 110:18–113:9), whether "Mr. Mike Distefano" is truly an ex-inmate is immaterial, because

it is undisputed that he is not an attorney, (Def.'s 56.1 ¶ 12), and Plaintiff provides no non-

conclusory evidence to support his claim that the listed charges were baseless.  Thus, the Court finds that even if Plaintiff could demonstrate that Defendant had a retaliatory motive in issuing the April 2, 2013 misbehavior report, it is undisputed that Plaintiff did, in fact, commit the conduct in question.  *See Hynes v. Squillace*, 143 F.3d 653, 657 (2d Cir. 1998) ("[T]he conclusion that state action would have been taken in the absence of improper motives is readily drawn in the context of prison administration where [courts] have been cautioned to recognize that prison officials have broad administrative and discretionary authority over the institutions they manage." (first alteration in original) (quotation marks omitted)); *accord Mack v. Hall*, No. 18-CV-875, 2020 WL 5793438, at *9 (N.D.N.Y. July 27, 2020) (same).

Accordingly, the Court finds that there is no genuine dispute of material fact that Defendant's issuance of the April 2, 2013 misbehavior report was not in retaliation for Plaintiff's conduct as part of Woodbourne's IGRC, and Defendant's Motion is granted.  As such, the Court declines to address Defendant's arguments that Defendant is entitled to qualified immunity and that Plaintiff's claim for mental or emotional injuries must be dismissed for failure to demonstrate physical injury.  (*See* Def.'s Mem. 17–20.)

21

### III.  Conclusion

For the foregoing reasons, Defendant's Motion for Summary Judgment is granted.

The Clerk of Court is respectfully directed to terminate the pending Motion, (Dkt.

No. 156), enter judgment for Defendant, mail a copy of this Opinion to Plaintiff at 279 Butler

Street, Brooklyn, NY 11217,[6] and close this case.

SO ORDERED.

Dated:    December 1, 2021
        White Plains, New York

                                    KENNETH M. KARAS
                              United States District Judge

---

[6] Via a letter to the Court dated July 6, 2021, Defendant informed the Court that Plaintiff's previous pro bono counsel had alerted Defendant on November 2, 2020 (prior to pro bono counsel's withdrawal from this Action) that Plaintiff's current address is 279 Butler Street, Brooklyn, NY 11217, rather than the address listed on the docket.  (*See* Dkt. No. 166.)